UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

Civil Action No. 7:11-CV-00169-BO

| | | |
|---|---|---|
| CHRISTINA LYNN JACOBS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM IN** |
| | ) | **SUPPORT OF** |
| N.C. ADMINISTRATIVE OFFICE | ) | **DEFENDANTS' MOTION** |
| OF THE COURTS, and JAN | ) | **FOR SUMMARY JUDGMENT** |
| KENNEDY in her official capacity as | ) | |
| NEW HANOVER COUNTY CLERK | ) | (Fed. R. Civ. P 56(c)) |
| OF SUPERIOR COURT, | ) | |
| Defendants. | ) | |

NOW COME Defendants, by and through Roy Cooper, North Carolina Attorney General, Valerie L. Bateman, Special Deputy Attorney General, and Kathryn Shields, Associate Attorney, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, and move the Court to grant Defendants' summary judgment on Plaintiff's Complaint. In support the undersigned show unto the Court the following:

## STATEMENT OF THE CASE

Plaintiff has alleged that the Clerk of Superior Court for New Hanover County, in her official capacity, and the Administrative Office of the Courts terminated her employment as a deputy clerk in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. The duly elected clerk at the time Plaintiff was dismissed was Brenda Tucker; the current duly elected clerk is Jan Kennedy.

## STATEMENT OF FACTS

The Office of the Clerk employed approximately sixty-five individuals and consisted of four divisions: estates and special proceedings, juvenile, civil, and criminal. Tucker Dep p 21[1]; Kennedy Dep p 16. Plaintiff was hired by Brenda Tucker as an office assistant on January 7, 2009. Jacobs Dep p 49; Tucker Dep pp 36, 39-40. As an office assistant, an unsworn position, Plaintiff's duties were limited to scanning files onto microfilm and filing. Kennedy Dep p 40; Tucker Dep 37, 40; Jacobs Dep p 45. The

---

[1] Affidavits are cited by last name of each affiant and relevant paragraph number(s) or Exhibits. Depositions are cited by the last name of each deponent and the page and line number.

microfilm machine was located in a private office in the back corner of the Civil Division. Kennedy Dep p 44, Jacobs Dep p 50.

On or about February 3, 2009, Ms. Tucker promoted Plaintiff to a deputy clerk position in the Criminal Division. Tucker Dep p 41; Kennedy Dep p 47, Ex 17; Jacobs Dep p 56. This division was comprised of approximately thirty clerks, including three assistant clerks and twenty-seven deputies. Kennedy Dep p 19; Excell Dep pp 16, 22. Jan Kennedy, Debra Excell, and Melissa Griffin were the assistant clerks and supervisors in the Criminal Division. Kennedy Dep p 49, Excell Dep p 21, Griffin Dep p 31. Within the Criminal Division, Griffin generally supervised the deputy clerks assigned to superior court, while Kennedy and Excell supervised the remaining deputies, including Plaintiff. Kennedy Dep pp 49, 81; Excell Dep p 21; Griffin Dep p 31, 49; Jacobs Dep p 76.

For a period of time, Plaintiff's job duties as a Deputy Clerk did not differ from those of the office assistant position. Tucker Dep p 44, Jacobs Dep p 56. In or about March of 2009, Plaintiff began training at the front counter with Ashley English. Jacobs Dep p 57. Plaintiff's duties at the front counter included opening the mail, answering the telephone, and running criminal record checks. Kennedy Dep p 80; Excell Dep pp 24, 61; Griffin Dep pp 19-20; English Dep pp 16, 19. She also continued to scan files onto microfilm. Jacobs Dep p 59, Tucker Dep p 49, Kennedy Dep p 47, English Dep p 69. Plaintiff was assigned to microfilm one day a week and to work at the front counter the other four days. Tucker Dep p 59, Jacobs Dep p 99, Mathis Aff ¶ 5. New deputy clerks, who don't have prior experience, are assigned to work the front counter because it exposes them to the varied situations which can arise at Clerk's office. Tucker Dep pp 51-52, 56; Kennedy Dep pp 31, 34; Excell Dep p 24, 61; Griffin Dep pp 19-20; Stewart Aff ¶ 3; Mathis Aff ¶ 10. In addition to Plaintiff, three other deputies worked at the front counter – two as cashiers and one who performed the same job duties as plaintiff minus scanning files onto microfilm. Tucker Dep p 30, Kennedy Dep p 31, Excell Dep p 22, Griffin Dep p 20, Jacobs Dep p 58, Mathis Aff ¶ 3. Owen Mathis worked at the front counter with Plaintiff. Jacobs Dep p 58, Mathis Aff ¶ 5. Plaintiff enjoyed working at the front counter. Jacobs Dep p 61.

Training: Ashley English, another deputy, was assigned as Plaintiff's trainer when Plaintiff was initially hired as the office assistant. Kennedy Dep p 50; Excell Dep p 33; Jacobs Dep pp 51, 76. English is Brenda Tucker's niece. Tucker Dep pp 53-54. During training, Plaintiff sat with English at the microfilm machine and learned how to scan files and then how to file the disposed files. English Dep pp 57-58, 61; Kennedy Dep pp 50, 214; Excell Dep pp 33; Jacobs Dep p 51. English gave Plaintiff her notes from when she was trained to scan files onto microfilm to help Plaintiff during training. Kennedy Dep p 214; English Dep pp 48, 72. English had to show Plaintiff more than once how to scan the files. English Dep p 61. English continued to train Plaintiff after she was promoted and assigned to the front counter. Tucker Dep p 53; Kennedy Dep p 50; Excell Dep p 33; Jacobs, Dep pp 57, 76-77. In addition to Plaintiff, English trained several other deputies at the front counter and in other positions. Mathis Aff ¶ 4; English Dep pp 58-60.

The majority of training at the Clerk's Office occurs on the job. Tucker Dep pp 52-53. New deputies at the front counter shadow the deputy with more experience for about a week. Excell Dep p 61; English Dep pp 17-18; Jacobs Dep pp 57, 76-77; Mathis Aff ¶ 4; Stewart Aff ¶ 4. They are shown how to file disposed cases, read the computer screen, run a criminal background check, and respond to public inquiries. Excell Dep p 61, Jacobs Dep p 60, Mathis Aff ¶ 3. After a few days, the new deputy takes over the front counter duties. Kennedy Dep p 31, English Dep pp 17-18, Jacobs Dep p 57, Mathis Aff ¶ 3.

While training Plaintiff at the front counter, English gave Plaintiff a series of computer screen printouts with notes of common scenarios in an effort to teach Plaintiff how to read the computer screen. This occurred after Plaintiff told a woman that she had a pending warrant for her arrest when the woman only had a pending court date. Tucker Dep p 57, English Dep pp 72-74, Jacobs Dep p 80.

Plaintiff could not stay on task: On days Plaintiff was assigned to microfilm, English was assigned to fill in for her at the front counter. English Dep p 69, Excell Dep p 101. Plaintiff routinely took longer than the day assigned to complete her microfilm duties. Tucker Dep pp 49, 58, 60; Kennedy Dep pp 56-57; Excell Dep p 28; English; Dep 69; Mathis Aff ¶ 5. Instead of staying on task, Plaintiff socialized with the deputy clerks in the Civil Division. Tucker Dep p 60, Kennedy Dep p 42. Plaintiff's

friend Mallory Malter, with whom she ate lunch and socialized outside the office, worked in the Civil Division. Jacobs Dep pp 62, 74-75, 158. Plaintiff even stopped by Tucker's office, which was located in the Civil Division, to chat. Tucker Dep p 60. When Plaintiff took more than one day to microfilm, English and the other deputy clerks had to fill in for her at the front counter, which made it difficult for them to complete their own work. Tucker Dep pp 49, 60, 73; Kennedy Dep p 57; Excell Dep p 28; English Dep pp 68, 70; Mathis Aff ¶ 5. Tucker told Plaintiff it took her too long to microfilm. Jacobs Dep pp 100, 174. Excell also told Plaintiff she needed to pick-up her pace scanning files onto microfilm and then filing the disposed files. Excell Dep p 95.

Plaintiff was also seen by the Civil Division supervisors appearing to be asleep at the microfilm machine on at least two occasions. Caison Aff ¶ 4, Kennedy Dep p 43. Ms. Caison walked into the office where the microfilm machine was located and saw Plaintiff slumped, sitting at the microfilm machine with her bowed and her chin resting on her chest. Caison Aff ¶ 4. After Ms. Caison rustled the papers in her hands, Plaintiff picked her head up and corrected her posture. Caison Aff ¶ 4.

Plaintiff routinely wandered away from her duties at the front counter. Kennedy Dep p 56, Excell Dep p 39. Other deputy clerks reported to the supervisors and told them Plaintiff was not at the front counter and that they didn't know where she was. Kennedy Dep pp 56-58. Kennedy and Excell spoke to Plaintiff about wandering off from the front counter, telling her that she needed to stay on task and remain at the counter to help the public. Kennedy Dep p 63, Excell Dep p 39. In response, Plaintiff debated with Kennedy over her instructions or Plaintiff asked to be allowed to leave. Kennedy Dep p 63.

When not working at her work station at the front counter, Plaintiff's coworkers and supervisors saw her at a cubicle in the back of the office with her head down on the desk. Kennedy Dep pp 171, 197; Excell Dep p 38; English Dep p 63. The deputies have cubicles towards to the back of the office. Kennedy Dep p 35, English Dep p 63, Jacobs Dep p 51. Plaintiff had a desk at a cubicle in this area. Jacobs Dep p 51, Kennedy Dep p 171, Excell Dep p 38, English Dep p 63. On two separate occasions, Kennedy and Excell walked by Plaintiff and saw her with her head down on her desk appearing to be asleep. Kennedy Dep p 171, Excell Dep p 38. Both times, Kennedy and Excell asked Plaintiff is she was

feeling okay and Plaintiff replied that she was just tired. Kennedy Dep p 171, Excell Dep p 39. Kennedy told Plaintiff she could not lay her head down on the desk. Kennedy Dep pp 171-172. A few days later, Kennedy again approached Plaintiff when she had her head down on the desk and asked Plaintiff if she was feeling bad. Kennedy Dep p 172. Plaintiff again told her she was tired and Kennedy told her she could not have her head down on the desk during working hours. Kennedy Dep p 172.

Performance Problems – interactions with co-workers: Plaintiff created dissension among the deputies in the Criminal Division. Kennedy Dep pp 199, 200; Excell Dep p 33. Plaintiff's trainer would show Plaintiff how to do a task, and then Plaintiff would go to multiple other deputies and ask them how to perform the same task. Tucker Dep pp 49, 93; Kennedy Dep pp 67, 201-202; Excell Dep pp 33, 35; Griffin Dep p 35. If their answer differed from her trainer's method, Plaintiff would argue with her trainer, or she would tell the other deputies "that's not how another deputy clerk told me to do it" and argue with them. Tucker Dep pp 49, 93; Kennedy Dep pp 68, 200, 202. Plaintiff's repetitive questioning and arguing disrupted the office. Tucker Dep p 93; Kennedy Dep pp 200, 207.

Shortly after Plaintiff became a deputy in late April or early May, 2009, there was an incident between Plaintiff and English. Tucker Dep pp 130, 143; Excell Dep p 37; Jacobs Dep pp 78, 82. The incident was described to the supervisors, who did not see it, as an outburst and to Tucker as a melt-down. Tucker Dep pp 130, 143; Excell Dep p 37. Tucker was first informed of the incident by a local attorney telling her "boy, you've got a lot of action in criminal [today]." Tucker Dep p 67. Afterwards, Ms. Tucker had a meeting with Plaintiff, English, and Kennedy in Kennedy's office. Tucker Dep pp 67-68; Kennedy Dep pp 71, 211; Jacobs Dep pp 80-81; English Dep p 75. Ms. Tucker said that she had heard there were some problems between Plaintiff and English and asked them what was going on. Plaintiff stated she did not believe English was treating her fairly and that she did not think she could work with English any longer. Tucker Dep p 68, Kennedy Dep p 72, Jacobs Dep p 81. English and Plaintiff were told to take their issues or questions to their supervisor. Tucker Dep p 66, Kennedy Dep pp 69-70, English Dep p 75. Tucker excused English from the meeting and Plaintiff remained. Tucker asked Plaintiff what it would take to get her to do her job and asked her why it was taking so long to microfilm.

Tucker also told Plaintiff she had been untruthful with Tucker and that this incident was her last chance. Tucker Dep pp 60, 144; Kennedy Dep pp 72- 73; Jacobs Dep pp 81, 170, 174.   Afterwards, Ashley Stewart was assigned as Plaintiff's new, second trainer.   Kennedy Dep pp 69, 73; Excell Dep p 53; English Dep p 75; Stewart Aff. ¶ 5.

Also while in Kennedy's office, because it was taking Plaintiff so long to learn the duties of a deputy clerk, Tucker offered Plaintiff the option to return to the office assistant position part-time, which was the only position available.  Tucker Dep pp 118, 120; Kennedy Dep p 73.  Plaintiff declined, saying she needed the benefits, and told Ms. Tucker she could do the deputy job and asked her for a second chance.  Kennedy Dep 73.

Plaintiff's job performance did not improve after Stewart starting working with her.   Kennedy Dep p 78; Excell Dep p 103; Stewart Aff ¶ 6.   Stewart reported to Kennedy that Plaintiff was "just not getting it," referring to her job duties.   Kennedy Dep p 78; Stewart Aff ¶ 6.   Stewart reported Plaintiff asked her basic, simple questions, over and over.   Excell Dep, p 103; Stewart Aff ¶ 6.   Plaintiff did not grasp the fundamentals of her job as compared to other deputy clerks Stewart trained.   Stewart, Aff ¶ 6. Plaintiff's job performance problems were based on her poor attitude and lack of effort.   Stewart, Aff ¶ 6.

Plaintiff did occasionally interact socially with her co-workers at the Clerk's office.   Jacobs Dep pp 63, 64, 66-67, 73; Stewart Aff ¶ 8.   Plaintiff went with Mallory Malter to an outdoor concert and to dinner with three other deputies.  Jacobs, Dep pp 73-74.   Plaintiff also attended a Bachelorette Party for two deputies in Carolina Beach in July 2009.  Jacobs Dep pp 64, 66-72; Ex 28-31.

<u>Performance Problems – Interactions with Supervisors</u>

It came to Kennedy's attention that Plaintiff was not properly issuing search warrants.   Kennedy Dep p 102, Ex 2.  On May 28, 2009, Kennedy re-explained the process on how to properly issue search warrants.  Kennedy Dep pp 102-104; Ex 2.  This was the second time Kennedy had to speak to Plaintiff about incorrectly processing search warrants.  Kennedy Dep p 104.

Plaintiff was also untruthful with Tucker and Sandra Gerstenmier, another deputy who worked in

superior court, regarding showing a list of juror names on the "jury sheet" to a woman at the front counter. Tucker Dep p 128; Kennedy Dep pp 75, 209; Excell Dep p 40; Gerstenmier Aff ¶ 3. On that day, a woman came to the counter and asked Plaintiff for the names of the jurors who convicted her brother of murder. Kennedy Dep p 74. Plaintiff went to Sandy Gerstenmier's office for help as Plaintiff wanted to make sure she gave the woman the right list. Gerstenmier Aff ¶ 3; Excell Dep p 42. Plaintiff adamantly denied showing the woman the jury sheet. Tucker Dep pp 129, 136; Gerstenmier Aff ¶ 3; Kennedy Dep pp 75-76; Excell Dep p 43; Griffin Dep pp 38-39. However, the woman confirmed Plaintiff showed her the jury sheet by accurately describing its appearance. Tucker Dep pp 128, 136; Excell Dep p 43; Kennedy Dep pp 75-76; Gerstenmier Aff ¶ 4. Afterwards, Tucker talked to Plaintiff and told her that she would not tolerate lying by anyone that worked for her. Tucker Dep pp 128-129; Kennedy Dep p 77.

In late April or early May of 2009, Plaintiff went to Excell and told her that she was having some social issues and that she was nervous working at the front counter. Jacobs Dep pp 83, 160-161; Excell Dep pp 45-46. Plaintiff told Excell she was on medication in college for those issues. Excell Dep p 45; Jacobs Dep p 84. Plaintiff said her issues were manifesting at the front counter and asked Excell if it was possible to return to the office assistant position. Excell Dep p 45; Jacobs Dep p 82. Excell encouraged Plaintiff by telling her it was normal and that everyone felt nervous when they new to the counter. Jacobs Dep pp 83, 161. Excell told Plaintiff that talking to her doctor sounded like a good idea. Excell Dep pp 45, 93; Jacobs Dep p 84.

Soon thereafter, Tucker received a call from Excel informing her that Plaintiff was absent from work again or that Plaintiff left early. Tucker Dep p 75; Excell Dep p 50. During this call, Excell relayed to Tucker her prior conversation with Plaintiff and Tucker made a note about it. Tucker Dep pp 75, 77; Ex 11. At that time, Plaintiff did not tell anyone that she had a "disability" nor did she ask for any accommodation. Excell Dep pp 48, 91; Tucker Dep pp 174-175. Plaintiff only told Excell that she had "social issues." Excell Dep p 48. Plaintiff did not follow up with Excel or anyone else in the Clerk's office until she sent an email to her supervisors in September 2009. Tucker Dep p 175; Excell Dep p 45;

Jacobs Dep p 86.

It had become obvious to Tucker, when Excel reported Plaintiff either had not come in or left early, that Plaintiff was choosing not to do her job and that she was having continued problems with her work performance. Tucker Dep p 77. Tucker told Melissa Griffin that if the problems with Plaintiff persisted, then Tucker's decision was to let Plaintiff go. Tucker Dep p 78; Griffin Dep p 50. Tucker wanted to terminate Plaintiff in March or April 2009. Tucker Dep p 190; Griffin Dep p 57. She did not do so, however, because Griffin asked Tucker to give Plaintiff another chance and told Tucker that she wanted to try and work with her. Griffin Dep p 50; Tucker Dep pp 79-80. Tucker agreed but told Griffin if they had to meet about Plaintiff again it would be to terminate her. Tucker Dep pp 80, 94.

Plaintiff also was argumentative with Kennedy when Kennedy brought it to Plaintiff's attention she was not time stamping and keeping original probation violations when they were filed. Tucker Dep p 50; Kennedy Dep pp 60, 62, 115-116. The procedure for processing probation violations changed statewide in August 2009. Kennedy Dep p 60; Ex 3. On August 11, 2009, Kennedy emailed the deputies in the Criminal Division to inform them about the change and to give instructions on how to process probation violations according to the new policy. Kennedy Dep pp 61-62; Jacobs Dep p 92; Ex 3. Kennedy went over the policy change with Plaintiff. Kennedy Dep p 61. Two weeks later, on or about September 3, 2009, Kennedy learned that Plaintiff was processing the probation violations incorrectly. Kennedy Dep p 61; Ex 2, p 3 of 5. When Kennedy corrected Plaintiff, Plaintiff became argumentative, questioning Kennedy about the email Kennedy sent to the staff. Kennedy Dep p 60; Jacobs Dep pp 92-93. Plaintiff told Kennedy that Kennedy had not explained the procedure to her correctly and thus Plaintiff didn't understand and misunderstood Kennedy's email. Kennedy Dep p 61; Jacobs Dep p 93; Ex 2, p 3 of 5.

In early September, 2009, Tucker was scheduled to take a two-week vacation. Tucker Dep p 89; Kennedy Dep p 90. Her absence from the office was extended unexpectedly because her daughter had surgery and suffered extreme complications. Tucker did not return to the office until September 29, 2009. Tucker Dep pp 90, 93; Kennedy Dep p 90. Soon after Tucker left for vacation, on September 8, 2009,

Plaintiff sent an email to Excel, Griffin, and Kennedy, and for the first time, Plaintiff expressed that she had social anxiety disorder and a "disability" for which she needed an "accommodation." Kennedy Dep pp 90-91; Griffin Dep pp 45-46; Excell Dep p 54; Ex 1. In her email, Plaintiff requested to be switched from the front counter to another position and to work at the front counter only one day a week. Kennedy Dep p 90, Griffin Dep pp 45-46, Jacobs Dep Ex 1.

Excel, Griffin, and Kennedy told Plaintiff that they were unable to respond to her email and that Tucker would have to make that decision upon her return to the office. Kennedy Dep pp 90-91; Excell Dep pp 54-55; Griffin Dep pp 48, 60; Jacobs Dep p 162. During this same time period, unbeknownst to Excel, Griffin, or Kennedy, Tucker's assistant, Alice Radewicz, communicated to Tucker one or perhaps two reports of observing Plaintiff asleep at the microfilm machine. Tucker Dep pp 91, 125, 179; Radewicz Dep pp 31-32, 48. Tucker told Radewicz that she was going to solve the problem with Plaintiff when she returned to the office. Tucker Dep p 91.

Plaintiff forwarded the September 8 email to Tucker the next day. Jacobs Dep p 165, Ex 19. Tucker did not check her email while out of the office in September 2009. Tucker Dep p 90. Tucker did not ask her assistant Alice Radewicz to check her email while she was out and told Radewicz to only contact her in case of an emergency. Tucker Dep p 90, Radewicz Dep pp 34-35. Radewicz was unaware of Plaintiff's email to Tucker at the time she called Tucker. Kennedy, Excell, and Griffin did not mention Plaintiff's email to Radewicz. Kennedy Dep p 148, Griffin Dep p 48. Radewicz Dep pp 47-48.

Two days after Plaintiff sent the email requesting to move to a position away from the front counter, Plaintiff submitted at least five "Applications for Leave," or leave slips, to Kennedy, which Kennedy deemed a very unusual request because of the number. Kennedy Dep pp 107, 127; Ex 2, pp 2, 4. Plaintiff told Kennedy she wanted to take time off to go to doctors appointments and to take personal vacation. Kennedy Dep p 107, Ex 2 p 2. Kennedy did not approve the leave slips; instead she told Plaintiff she would have to talk to Ms. Excell before doing so. Kennedy Dep pp 107, 110, 128, Ex 2 p 2.

About a week later, on or about September 17, 2009, Plaintiff did not call-in and speak to one of her supervisors before being absent from work. Kennedy Dep pp 121-122, 125; Excell Dep p 69; Jacobs

Dep p 121. Instead, Plaintiff called Ms. Excell and left a message on her voicemail the night before, but Plaintiff did not speak directly to one of her supervisors which was the normal procedure for calling-in absent. Kennedy Dep pp 120, 121-122; Excell Dep p 69; Jacobs Dep p 120. Kennedy called Plaintiff when she didn't show up for work and could not get in touch with Plaintiff. Kennedy Dep pp 121, 125, Ex 2 p 4. Later in the morning Kennedy checked Ms. Excell's voicemail, who was not at work that day, and found a message from Plaintiff. Kennedy Dep pp 121, 125.

Plaintiff was frequently absent from work in September 2009, while Tucker was out of the office. Excell Dep p 68. Some of Plaintiff's absences were planned, while others were not. Excell Dep p 69. Excell did not formally speak to Plaintiff about her absences. Excell Dep p 80. But Excell told Plaintiff it was difficult for the office to manage when Plaintiff was absent because another deputy clerk had to fill in for Plaintiff at the front counter, which was getting increasingly difficult to do since the other clerks were already multi-tasking. Excell Dep p 80, Griffin Dep p 60.

Tucker decided while out of the office that she was going to terminate Plaintiff because she had been given plenty of opportunity to improve her performance and she shouldn't have to be warned repeatedly about sleeping on the job. Tucker Dep p 92. When Tucker returned to the office on Tuesday, September 29, 2009, she asked Griffin, Excell, Kennedy, and Plaintiff to come to her office. Tucker Dep pp 94-95; Excell Dep p 64; Griffin Dep pp 49, 51, 54; Jacobs Dep p 167. When Griffin came to Tucker's office, Tucker asked Griffin whether there was any reason to prolong Plaintiff's employment any further, to which Griffin conceded there was not and that she had been given a chance to prove herself and Plaintiff wasn't getting it. Tucker Dep p 94, Griffin Dep pp 50-51, Kennedy Dep p 141. Neither Kennedy, Excell, nor Griffin mentioned Plaintiff's email to Tucker. Kennedy Dep pp 147-148, Excell Dep p 68, Griffin Dep p 54. When Jacobs arrived, Tucker told Plaintiff that it was not working out because Plaintiff was not getting it and that she would have to let Plaintiff go. Tucker Dep p 95; Jacobs Dep p 168, Ex 37. Plaintiff secretly taped the conversation with Tucker because Tucker told Plaintiff she was untruthful and a know-it-all the last time Plaintiff spoke to her. Jacobs Dep pp 169-170, 173; RPD, #1; Ex 37. The transcript of the recording, made by Plaintiff, indicates that Tucker had no knowledge of

Plaintiff's request for accommodation at the time she made the decision to terminate Plaintiff or even at the time she terminated Plaintiff. Tucker Dep pp 96, 189-190; Ex 37. And at her deposition, Plaintiff also confirmed[2] that Tucker had no knowledge of her alleged "disability" at the time she decided to terminate her or even at the actual time she terminated her. Jacobs Dep p 242, Tucker Dep pp 189-190. Tucker pulled up Plaintiff's email from September 9, 2009, and printed it out during the meeting with Plaintiff after Plaintiff mentioned it. Tucker Dep p 95.

After the meeting in Tucker's office, Plaintiff went back to her work station at the front desk. Jacobs Dep p 171. Later in the day, Kennedy called Tucker to report that Plaintiff was going from cubicle to cubicle telling the clerks that she had been terminated. Tucker Dep p 99; Kennedy Dep pp 112, 150, Ex 2 pg. 2 of 5. Tucker angrily wrote notes on the email plaintiff sent her on September 9, 2009, upon learning she was going from desk to desk disrupting the office. Tucker Dep pp 100, 111, 114; Ex 19. Plaintiff was initially told she could work until the end of the month, but because Plaintiff was disrupting the office, September 29, 2009, was Plaintiff's last day. Tucker Dep pp 99-100.

Although no other employees had ever formally requested an "accommodation" for a "disability," the facts show that Tucker had actually "accommodated" other employees with various health-related issues. Tucker Dep pp 82, 84, 114; Excel Dep p 14. A deputy clerk who believed there was an issue with the air quality in her office was relocated to another office to make the deputy clerk more comfortable. Tucker Dep p 83. Without being asked, Tucker relocated a deputy clerk's parking spot when she was diagnosed with breast cancer so that she would not have to walk as far while undergoing chemotherapy treatments. Tucker Dep pp 84-85. Tucker transferred Excell from the courtroom to another position when Excell developed a medical condition which prevented her from being able to remain in the courtroom sitting for long periods of time. Excell Dep p 14.

Plaintiff's testimony in her deposition attempts to create a genuine issue of material fact. Plaintiff, parsing her words, recalled that none of her supervisors ever counseled her about her work

---

2  Although Plaintiff's counsel attempted via leading questions to rehabilitate Plaintiff's testimony on re-direct at her deposition, that conflicting testimony is inadmissible as leading and can not serve to create a genuine issue of material fact. F.R. Civ. P. 56(c);

performance despite Tucker, who Plaintiff viewed as her boss and not a supervisor, telling Plaintiff she believed her to be untruthful and that she microfilmed too slowly. Jacobs Dep p 91. Further, Plaintiff suggested that because the Clerk's office had no policy on communicating job performance issues or any performance appraisal system that Plaintiff had no job performance issues and that she was qualified for her position at the time she was terminated. Jacobs Dep 91. Plaintiff also denied ever being asleep or not alert during work hours, and upon attempted rehabilitation during cross examination by her attorney, plaintiff stated she was on a break when she had her head down on her desk and had a sign on her desk stating she was on a break. Jacobs Dep pp 118- 119.

Additionally, Plaintiff disagreed with her supervisors and co-workers over how certain events, which placed Plaintiff in an unfavorable light, occurred but Plaintiff does not dispute the fact that those events occurred. Plaintiff recalls speaking to Kennedy about the new procedure for processing probation violations. Plaintiff's testimony attempted to paint Kennedy at fault for being unclear, which was clearly consistent with the impression Kennedy had that Plaintiff was blaming Kennedy for her mistakes. Plaintiff testified that Kennedy's email to Plaintiff and her other co-workers, including Owen Mathis who worked with Plaintiff at the front counter, was not meant for Plaintiff and that Plaintiff should ignore Kennedy's instructions in the email. Jacobs Dep p 91-93. Plaintiff also recalls telling Excell specifically that she had "social anxiety disorder." Jacobs Dep p 160. Plaintiff also disputed her supervisor's version of the expected procedure for calling in absent, and she testified in her deposition that it was permissible to leave a message. Jacobs Dep p 120.

<u>Expert Report Findings:</u> Dr. George P. Corvin prepared a forensic psychiatric evaluation of Plaintiff by assessing Plaintiff's medical records and reviewing her Facebook account and certain other documents provided in discovery in lieu of evaluating Plaintiff personally as Plaintiff refused to submit herself for a forensic psychiatric evaluation on August 31, 2012. The documents Dr. Corvin reviewed are listed in his report, which is attached to his Affidavit. Dr. Corvin's analysis of Plaintiff's medical records revealed that for a number of years, Plaintiff has intermittently been given a diagnosis of Social Anxiety Disorder, among other anxiety and mood related psychiatric conditions, by general practitioners.

Plaintiff's medical records detailing her treatment, while employed at the Clerk's office and following her separation from the Clerk's office, fail to establish a pattern of symptoms consistent with this illness, nor do they document her involvement in adequate treatment for such a condition. Plaintiff's records demonstrate that she did experience a pattern of ongoing occupational and interpersonal difficulties at the Clerk's Office prior to being separated; however, Dr. Corvin concluded there was no reasonable basis to conclude that these problems resulted from her claimed impairment related to her diagnosis of Social Anxiety Disorder.

Dr. Corvin made the following additional conclusions: 1) Although there are entries in Plaintiff's medical records referencing a history of Social Anxiety Disorder, this condition is more often than not repeated as a historical diagnosis as Plaintiff's records are scant on actual descriptions of specific symptoms and impairments related to this condition; 2) Despite Plaintiff's medical records documenting a history of social phobia or some other anxiety/mood related condition, the descriptions of her symptom patterns provide little support for such a diagnosis; 3) even assuming Plaintiff has met the historical diagnostic criteria for Social Anxiety Disorder, Plaintiff has not received appropriate treatment on an on-going basis to manage such a condition or mitigate any possible effects on her everyday life; 4) Plaintiffs medical records during her time of employment at the Clerk's office provide little evidence that she was experiencing clinically significant problems with anxiety and similarly reveal little focus on treating any anxiety disorder that did in fact exist; and 5) an analysis of Plaintiff's occupational activities since being separated from the Clerk's Office, as well as Plaintiff's social interactions on-line on Facebook, and video surveillance of Plaintiff by private investigator Bert Croom interacting with peers and customers in her current place of employment, are in almost all respects inconsistent with a conclusion that Plaintiff meets the criteria for Social Anxiety Disorder.

## STANDARD OF REVIEW

Defendants are entitled to summary judgment if, when considered in the light most favorable to plaintiff, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c) (2004); *Hill v. Lockheed Martin Logistics*

*Mgmt.*, 354 F.3d 277, 282 (4th Cir. 2004). The question to be answered is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original). The plaintiff may not rest on her allegations "without 'any probative evidence tending to support the complaint.'" *Id.* at 249 (quoting *First Nat'l Bank of Az. v. Cities Service Co.*, 391 U.S. 253, 290 (1968). Only if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," should the motion for summary judgment be denied. *Metric/Kvearner Fayetteville v. Fed. Ins. Co.*, 403 F.3d 188, 197 (4th Cir. 2005). *See also White v. York Internat'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995)("The very purpose of a summary judgment action is to determine whether trial is necessary" and "the nonmoving party must, at a minimum, direct the court to *facts* which establish a genuine issue for trial.")(Emphasis in original).

## ISSUES

Plaintiff's complaint read broadly and in Plaintiff's favor can be construed to allege three different claims: termination based on her alleged disability, termination based on retaliation for requesting an accommodation, and a failure to accommodate claim that apparently, Plaintiff contends, had it been granted would have obviated her termination for unacceptable performance. None of these claims survive summary judgment because Plaintiff is unable to show there is any genuine issue of material fact as to each element of each of these claims.

## SUMMARY OF ARGUMENT

### I.    WRONGFUL TERMINATION/RETALIATORY TERMINATION

The ADA mandates that "no covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a) (2012). Where there is direct evidence of discrimination, a plaintiff must satisfy a three-pronged test to establish a prima facie case of a violation of the ADA. *Benson v. E.I. du Pont de Nemours & Co.*, 2001 U.S. Dist. LEXIS 23356, at 12-13 (W.D. Va. 2001). Plaintiff must prove first, that she has a "disability;" second, that she is a "qualified individual;" and third, that "'in discharging' [her], [her]

employer 'discriminated against [her] because of [her] disability.'" *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997) (quoting 42 U.S.C. § 12112(a) (1994)).

Where, as here, there is no direct evidence of discrimination, the Fourth Circuit held that the burden-shifting framework of *McDonnell Douglas,* 411 U.S. 792, 802 (1973) , applies to cases brought under the ADA. *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995). Under this framework, the plaintiff has the initial burden of proving a prima facie case of discrimination. *Id.* Then, the burden shifts "to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* "If the defendant meets this burden of production, the presumption created by the *prima facie* case "drops out of the picture," and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination. *Id.*

The prima facie case was explained as having these elements: "[i]n a typical discharge case brought under the ADA, a plaintiff must prove by a preponderance of the evidence that (1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Id.*

Applying this test to the current case, Plaintiff fails the first element because she was not disabled, as discussed below. However, even assuming *arguendo* she was in a protected class and that she was discharged, Plaintiff is unable to prove, other than using her own self-serving testimony, that she was performing her job at a level that met her employer's reasonable expectations. Finally, even if Plaintiff could establish that she was performing at a level that met her employer's expectations, Plaintiff cannot establish the fourth element, because her discharge did not occur under circumstances that raise a reasonable inference of discrimination. Plaintiff did not communicate her disability to her employer until her disciplinary issues arose. When Tucker decided to terminate Plaintiff she had no knowledge of Plaintiff's disability. She did not know of Plaintiff's disability even at the time she actually terminated Plaintiff. Under these circumstances, there can be no reasonable inference of discrimination. Thus, Plaintiff has failed to make out a prima facie case of discrimination or retaliation under the ADA.

A retaliatory discharge claim under the ADA has three prima facie elements that must be proven by the Plaintiff: (1) that she engaged in protected activity; (2) that her employer took an adverse action against her; and (3) that a causal connection existed between the adverse activity and the protected action. *Haulbrook v. Michelin N. Am., Inc.,* 252 F.3d 696, 702 (4th Cir. 2001). Although Plaintiff can show that she was terminated, she can not show that she made a bona fide request for an accommodation based on a disability to her employer prior to her termination, or that a causal connection existed between her termination and her untimely request for an accommodation.

## II.    FAILURE TO PROVIDE REASONABLE ACCOMMODATION

A "failure to accommodate" claim should be analyzed differently from a "disparate treatment" claim. "In failure to accommodate claims, unlike disparate treatment claims, the *McDonnell Douglas* burden-shifting approach is not necessary or appropriate. [Citation omitted.] Instead, the plaintiff, in addition to showing that she is a qualified individual with a disability, must show that the employer was aware of her disability and still failed to reasonably accommodate it." *Hoffman v. Caterpillar, Inc.,* 256 F.3d 568, 572 (7th Cir. 2001)(citation omitted)). As stated above, when Tucker decided to terminate Plaintiff, she had no knowledge of Plaintiff's disability by both Tucker's and Plaintiff's own admissions. And Plaintiff's secret recording of her meeting with Tucker shows that Tucker did not know of Plaintiff's request for a "reasonable accommodation" even at the time she actually terminated Plaintiff. Because Plaintiff can establish neither that she was a qualified individual with a disability, nor that the decision maker in this case knew Plaintiff had a disability and unreasonably failed to accommodate it, Plaintiff can not survive summary judgment on her reasonable accommodation claim.

<u>ARGUMENT</u>

I.    <u>PLAINTIFF CAN NOT PROVE THAT THAT SHE WAS WRONGFULLY TERMINATED BASED ON HER ALLEGED DISABILITY OR BECAUSE SHE WAS RETALIATED AGAINST FOR REQUESTING AN ACCOMMODATION.</u>

As stated above, to prove a discriminatory discharge claim, Plaintiff must prove that (1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Ennis,* 53 F.3d at 58. *See also Rohan v. Networks Presentations LLC,* 375 F.3d 266, 272 n.9 (4th Cir. 2004); *Rhoads v. FDIC,* 257 F.3d

373, 387 n.11 (4th Cir. 2001); *Haulbrook v. Michelin N. Am., Inc.,* 252 F.3d 696, 702 (4th Cir. 2001). A retaliatory discharge claim under the ADA has three prima facie elements that must be proven by the Plaintiff: (1) that he engaged in protected activity; (2) that his employer took an adverse action against him; and (3) that a causal connection existed between the adverse activity and the protected action. *Haulbrook,* 252 F.3d at 706 .

### A. Discriminatory Discharge

#### 1. Plaintiff was not in a protected class.

Plaintiff is not a "qualified individual" under the ADA. Plaintiff is a qualified individual under the ADA if she is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . ." 42 U.S.C. § 12111(8) (2012). "[T]o determine whether [plaintiff] was qualified for the . . . position, we must decide (1) whether she could 'perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue,' and (2) if not, whether 'any reasonable accommodation by the employer would enable [her] to perform those functions.'" *Tyndall v. National Educ. Ctrs.*, 31 F.3d 209, 213 (4th Cir. 1994).

#### a. Essential Functions of the Clerk Position

To satisfy the first prong of this test, Plaintiff must "define the essential functions of [her] position" and must show that she "possess[ed] the skills necessary to perform the essential functions." *Munoz v. Balt. County*, 2012 U.S. Dist. LEXIS 103597, at 19 (D. Md. 2012). In determining which functions are essential to the job, the relevant evidence can include not only any written description of the job responsibilities but also "the employer's judgment as to which functions are essential; . . . the amount of time spent on the job performing the function; the consequences of not requiring the incumbent to perform the function; the terms of a collective bargaining agreement; the work experience of past incumbents in the job; and/or the current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3) (2012). Plaintiff actually does not define any of the essential functions of her position as Deputy Clerk; instead, she only states that she was scheduled to "work at the front counter," to "respond[]

to inquiries from the public," and that she would scan court filings into microfilm. Plaintiff's generalized listing of responsibilities does not show that these are "essential functions of her position." The undisputed testimony by Defendants' witnesses was that mastery of the duties involved in working at the front counter of the Clerk's office was essential to being able to successfully move on to performing other duties in the Clerk's office.

Even more problematic, Plaintiff has not alleged that she "possessed the skills necessary to perform" these responsibilities. Stated slightly differently, Plaintiff has not shown that she has the necessary "skill, education, experience, and training for [her] position" from previous positions held or otherwise. *See, e.g. Burdette v. Advanced Telemarketers Corp.*, 2009 U.S. Dist. LEXIS 106411, at 24 (N.D.W. Va. 2009) (citing Eighth Circuit cases that use this standard). Because Plaintiff has failed to show that she can perform the essential functions of her job, Plaintiff has not shown that she is qualified under the ADA. The bald assertion that she "was satisfactorily performing the essential functions of the position as Deputy Clerk and was a 'qualified individual with a disability' as defined in the ADA" is not enough to survive summary judgment. *See id.* at 20 (finding plaintiff failed to allege he was qualified under the ADA because "he does not go further to allege any facts to establish what makes these functions 'essential' or to show that he possessed the skills, willingness, and ability to perform them properly.")

The deposition testimony shows that everyone in the Clerk's office considered mastery of the front counter duties to be essential. "[T]he employer's judgment as to which functions are essential . . . are . . . [a] possible type[] of evidence for determining the essential functions of a position." *EEOC v. Dollar General Corp.*, 252 F. Supp. 2d 277, 286 (M.D. N.C. 2003)(employer held to have varied employee's assignments to accommodate her abilities and then argued later that she could not perform all essential functions). But the Court will also look at what the employer actually expected the employee to do in the position in which they worked. *Id.* In this case, there is no testimony to contradict the copious testimony of the Clerk's employees that at least mastery of the duties of working at the front counter was an essential function of being qualified to serve as a deputy clerk. Plaintiff argues only that she asked for

her job to be restructured; all the testimony is that she never even mastered the front counter or the other activities required for the deputy clerks.

b. Impairment that limits major life activity

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C) (2012). The ADA states that "the term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008." *Id.* at (4)(B). The ADA Amendments Act of 2008 (hereinafter "ADAAA") requires that "the definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." 122 Stat. 3553, sec. 3 § 4(A) (2008).

In this case, Plaintiff has alleged a disability due to Social Anxiety Disorder. Even construing this broadly, Plaintiff has failed to show that she has a disability within the meaning of the statute. Plaintiff alleges that her disorder substantially limits her ability to interact with others or her ability to work. Although "interacting with others" is a "major life activit[y]" under The Equal Employment Opportunity Commission's (hereinafter "EEOC") Implementing Regulations, see 29 C.F.R. § 1630.2(i)(1)(i) (2011), Plaintiff has failed to establish that she was, in fact, substantially limited in her interactions with others.

The EEOC explained that "an impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii) (2011). Plaintiff has not alleged that her ability to interact with others is substantially limited as compared to others in the general population. *But see Sechler v. Modular Space Corp.*, 2012 U.S. Dist. LEXIS 54478, at 28-29 (S.D. Tex. 2012) (finding that, although plaintiff failed to offer evidence of his impairment as compared to the general population, his testimony that he "had difficulty" with some of the major life activities defined in the ADAAA was enough to create a factual question about the existence of his disability); *Menchaca v. Maricopa Cmty. College Dist.*, 2009 U.S. Dist. LEXIS 5510 (D. Ariz. 2009) (rejecting summary judgment where plaintiff

has "sufficiently identified relevant major life activities that could be limited by her impairment"). Simply stating that "she can feel overwhelmed and experience panic attacks, with frequent bouts of nervousness and crying" does not establish that she was substantially limited in interacting with others. *See Wells v. State Manufactured Homes, Inc.*, 2005 U.S. Dist. LEXIS 6048, at 19-20 (D. Me. 2005) (applying reasoning of ADA cases, the court rejected summary judgment for the plaintiff because "no context is provided for the modifier 'significant'" in plaintiff's complaint, and the court cannot "equate, without more, avoiding contact with others with a substantial limitation on the ability to interact with others").

Although this comparison of plaintiff's condition with that of the general population typically "will not require scientific, medical, or statistical analysis," see 29 C.F.R. § 1630.2(j)(1)(v) (2011), medical analysis in the record clearly shows that Plaintiff's stress and nervousness actually do not limit her from interacting with others at all. In fact, Plaintiff is able to interact with others on a daily basis. After leaving her position at the Clerk's office, Plaintiff has enjoyed successful employment as a welcome desk worker in a hotel, a position that requires her to interact with members of the public consistently. Additionally, Plaintiff participates regularly in Tae Kwon Do and seems to have no trouble interacting with members of the public while engaging in practice, competitions, and trips in connection with this hobby.

Finally, Plaintiff's Facebook webpage makes it clear she is able to successfully and meaningfully interact and maintain relationships with a number of individuals. The Associated Press reports that Facebook has more than 955 million users as of June 2012. *Number of Active Users at Facebook Over the Years*, THE ASSOCIATED PRESS (Sept. 11, 2012), [3]. Facebook makes it easy for these users to interact with one another. As one law professor has explained, social networking sites such as Facebook "let[] you make new friends and deepen your connection to your current ones. . . . Communications technologies have been connecting people since long before the Internet, and many authors have noted the strength of online relationships." James Grimmelmann, *Saving Facebook*, 94 IOWA L. REV. 1137, 1154

---

3 http://finance.yahoo.com/news/number-active-users-facebook-over-years-214600186--finance.html

(2009) (citing Julian Dibbell, My Tiny Life: Crime and Passion in a Virtual World 235-63 (1998); Howard Rheingold, The Virtual Community: Homesteading on the Electronic Frontier (1993)). The author goes on to conclude, "Plenty of fake things happen on Facebook, but the social interaction is real." *Id.* at 1164. Clearly, Plaintiff is not significantly limited in her ability to interact with others and because of this does not have a disability recognized under the ADA.

Moreover, her supervisors and co-workers at the Clerk's office testify in their affidavits that Plaintiff was very social on the job and would frequently leave her position at the counter in order to go to another floor of the Clerk's office to socialize with other workers and the Clerk herself. Plaintiff was often argumentative and confrontational, which attributes are entirely inconsistent with having social anxiety and shying away from interactions with others. The evidence shows instead that Plaintiff did not want to work the front counter in the Criminal Division for some unspecified and unarticulated reason. There is no support whatsoever in the record, other than Plaintiff's own self-serving statements, that the reason she did not want to work the front counter was because she suffered from social anxiety.

Despite the fact that the statute is to be construed broadly, "not every impairment will constitute a disability within the meaning of this section." 29 C.F.R. § 1630.2(j)(1)(ii) (2011). For example, the Maryland District Court in *Wyatt v. Md. Inst.* found that the plaintiff was not substantially limited in the life activity of working, even when applying the broader standards set forth in the ADAAA, because he was able to work a forty hour work week, his inability to work overtime did not hinder his job prospects after his termination, and he had held other, similar positions since his termination. 2012 U.S. Dist. LEXIS 30465, at 15-16 (D. Md. 2012). Similarly, even applying the broad standards of the ADAAA, Plaintiff in this case cannot be said to be substantially limited in the life activity of interacting with others because she has many meaningful interactions with others in various contexts, including her active participation in Tae Kwon Do and social media, and she has been successfully employed in jobs requiring her to interact with others since her termination.

And though the courts have stated that a comparison of plaintiff's condition with that of the general population typically "will not require scientific, medical, or statistical analysis," see 29 C.F.R. §

1630.2(j)(1)(v) (2011), expert analysis of Plaintiff's current abilities do not demonstrate that she even suffers from social anxiety disorder, much less is impaired by it.

Because few courts have had the opportunity to consider disability cases since the ADAAA has taken effect, and because the ADAAA changes do not affect the pertinent legal analysis, it may be helpful to consider analysis of social anxiety disorder cases prior to the ADAAA. The District Court in *Rose v. Springfield-Greene County Health Dep't* found that the plaintiff was not qualified as "disabled" under the ADA as a result of her social anxiety disorder. 668 F. Supp 2d 1206 (W.D. Mo. 2009). The court found that, even if plaintiff's "mental impairment" qualifies as a disability (a fact that itself was in dispute), "the evidence is clear that her impairments do not substantially limit any of her major life activities." *Id.* at 1212. The record in that case contained little evidence of plaintiff's social anxiety disorder, showing a diagnosis only in 2006 despite the fact that plaintiff claimed to have suffered from it for thirty years. *Id.* at 1213. Furthermore, the record showed she had never "requested or taken prescription medication for her alleged disorders" and that she "held many different jobs, took vacations across the country, and moved residences in and out of Missouri 'quite a bit.'" *Id.* The court further noted that plaintiff had not provided evidence regarding any specific instances where she suffered from panic attacks that limited "her ability to perform any major life activities." *Id.* at 1213-14. "At most it appears Plaintiff's impairments offer no more than mild limitations compared to the general population, and the Eighth Circuit has repeatedly found individuals with similar limitations do not qualify as disabled under the ADA." *Id.* at 1214 (citing *Heisler v. Metropolitan Council*, 339 F.3d 622, 628-30 (8th Cir. 2003)).

Plaintiff's situation is quite similar to the plaintiff in *Rose,* despite the broader application of the ADA since the implementation of the ADAAA. Plaintiff has repeatedly told doctors and therapists that she suffers from Social Anxiety Disorder, but her medical records[4] indicate that she has only been diagnosed with this disorder once. See Affidavit of George Corvin, M.C., Attachment 1 (Plaintiff's Medical Records obtained from Plaintiff in discovery). Additionally, as Dr. Corvin notes, Plaintiff has

---

4 See attached email from Plaintiff 's counsel regarding unavailability of medical records from physician that allegedly provided the original diagnosis of social anxiety disorder. Judicial notice may be taken of the fact that the website for the Medical Board shows this physician, Sara Lynn Christiansen, surrendered her license in NC in 2009. http://www.ncmedboard.org/images/uploads/disciplinary_reports/2009BAreport.pdf

maintained many meaningful relationships and has engaged in a variety of social interactions, as described above. She has provided no specific evidence regarding panic attacks she has suffered. Just as the plaintiff in *Rose v. Springfield-Greene County Health Dep't*, Plaintiff's "impairments offer no more than mild limitations compared to the general population," and as such, as does not have a disability under the ADA.

> 2. Plaintiff was not performing her job at a level that met her employer's legitimate expectations.

However, assuming *arguendo* that Plaintiff can show she was in a protected class of individuals with a *bona fide* disabling condition, Plaintiff can not prove that at the time of her termination she was meeting her employer's legitimate expectations. The undisputed evidence in the record makes it clear she did not possess the skills necessary to perform her responsibilities. Two trainers working with Plaintiff at separate times were not able to teach her how to perform all of her necessary duties. As to the specific responsibilities Plaintiff has enumerated, the record shows she was not able to sufficiently work the front counter and respond to public inquiries because she was repeatedly absent from her station in order to socialize with others and was sometimes asleep at her station. Additionally, Plaintiff had incidents of poor performance involving a member of the public and a law enforcement officer. Plaintiff also struggled to scan court filings into microfilm, taking too long to complete this task.

The plaintiff's uncorroborated belief in her ability to perform the essential functions of her job is not enough to counter affirmative evidence to the contrary. *See White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir. 1995). And the evidence to the contrary in the record is that not only was Plaintiff was not skilled at front counter duties, but that she also had problems with sleeping on the job, being slow at her microfiche duties, and not getting along with co-workers. *See also Threatt v. County of Mecklenburg*, 1998 U.S. Dist. LEXIS 8081, at 22 (W.D.N.C. 1998) ("Because dealing effectively with taxpayer inquiries was an essential function of [Plaintiff's] position, and there is no dispute that [Plaintiff] did not adequately perform this function, the Court finds that no reasonable jury could find by the preponderance of the evidence that [Plaintiff] performed at a level that met his employer's legitimate expectations."). And courts have recognized that falling asleep at work is not acceptable behavior for an employee. *See,*

*e.g. Brewington v. Getrag Corp.*, 2011 U.S. Dist. LEXIS 118177, at 17 (W.D. N.C. 2011) ("Sleeping on the job hardly needs defending as a basis for termination. In various contexts, 'courts have repeatedly approved of ADA-challenged discharges for falling asleep at work, particularly in safety-sensitive positions.'") (citing *Grubb v. Southwest Airlines*, 296 Fed. Appx. 383 (5th Cir.2008)). Moreover, Plaintiff's employer's notes and deposition and affidavit testimony show that she was performing inadequately are evidence that she was not meeting her employer's standards for employment.

Finally, a plaintiff's attempts to "ignore or dismiss the substantial evidence documenting her chronic poor job performance" can not defeat a defendant's summary judgment motion. Where the evidence of "poor performance was so substantial and persuasive that no reasonable jury could find by a preponderance of the evidence that she was performing her job adequately," the Court reversed the district court and found that it should have entered summary judgment for the employer on those grounds. *Ennis,* 53 F.3d at 61-62. Likewise, in this case, Plaintiff will have to rebut volumes of testimony that she was performing her duties well in order to be able to create a genuine issue of material fact about this element with more than just her own testimony that no one ever said anything to her about her performance.

Plaintiff agrees that she had altercations with co-workers but disclaims responsibility for them. She agrees that she blamed Kennedy's lack of careful phrasing of her instructions for the fact that Plaintiff misunderstood some of her front counter duties. The fact that she failed to perceive these interactions as "poor performance" does not mean that they were not taken as indicia of poor performance by her supervisors. And because her poor performance is the heart of this case, and the heart of her claims of discrimination and retaliation, Plaintiff can not defeat summary judgment.

      3.   Plaintiff's discharge did not occur under circumstances that raise a reasonable inference of unlawful discrimination because Plaintiff can not prove that Brenda Tucker was aware that Plaintiff had an alleged disability at the time of her termination.

In this case, the events giving rise to the claim began in February of 2009, when Plaintiff was promoted to the position of Deputy Clerk, where she worked the front counter and responded to public inquiries. Plaintiff told Excel, her immediate supervisor, that she was having trouble with her medicine in

May of 2009, but she made no mention of any disability at this time.  Plaintiff struggled to adequately perform at work, in the eyes of her supervisors, yet she did not disclose any "disability" until early September, when she communicated via email to Excel, Griffin, and Kennedy that she had a "disability" and requested an "accommodation."  Tucker, the Clerk at the time, had no knowledge of Plaintiff's "disability" until after the time she decided to terminate Plaintiff.  Without this knowledge, there can not be a causal connection between the termination and alleged disability of social anxiety disorder.  *Holland v. Washington Homes, Inc.,* 487 F.3d 208, 218 (4th Cir. 2007), *cert. denied,* 552 U.S. 1102 (2008)("[t]he first thing [plaintiff] must be able to prove, therefore, is [the employer's] knowledge that he engaged in a protected activity.");  *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)(To prove a causal connection, plaintiff must be able to show that he was fired *"because* the plaintiff engaged in protected activity.")(emphasis in original)

In *Runnebaum v. Nationsbank*, 123 F.3d 156 (4th Cir. 1997), the Court found that not only had the plaintiff failed to prove pretext but that he had also failed to make out a prima facie case of discrimination sufficient to withstand summary judgment when the evidence in the record showed that the decision maker did not know of his HIV-positive status at the time she made the decision to terminate plaintiff.  *Id.* at 174.  The evidence showed that the decision maker met with the plaintiff on November 3, 1992, and at that meeting decided to terminate him because it was unlikely has would be able to perform his assigned duties.  *Id.* at 162.  Then, three days later, on November 6, she decided to give him another assignment in an attempt to allow him to redeem himself.  *Id.*  However, plaintiff's continued inability to meet sales goals and conduct himself professionally "confirmed Pettit's decision to discharge him" and in a memorandum dated January 7, 1993, she wrote a memorandum detailing his failure to comply with a previous July, 1992 memorandum and his failure to comport himself professionally warranted his discharge.  *Id.* at 163.  Plaintiff was summoned to a meeting on January 12, 1993, and was fired.  Plaintiff said that his firing "came as a total surprise.  I had no verbal warnings, no written warnings.  I was called in and let go and told I would be paid through the end of the month and it totally blindsided me."  *Id.*

Under virtually identical circumstances, our plaintiff 's behavior in the late winter and early spring of 2009, convinced Tucker that Plaintiff was not going to be successful at her job duties as a deputy clerk and that she needed to be let go in April, 2009, when she was three months into her employment and had had numerous difficulties, including the blow-up with her first trainer, Ashley English. However, based on Griffin's entreaties, Tucker relented and gave Plaintiff another chance, but told Griffin that if she had to meet again about Plaintiff that Plaintiff would be fired. In September, having received the reports from her assistant that Plaintiff was continuing to fall asleep at work, the proverbial straw that broke the camel's back, Tucker made up her mind again to terminate Plaintiff as soon as Tucker was back in the office; which she did. Plaintiff's surprise and lack of warnings notwithstanding, just like the Runnebaum plaintiff, were no reasons to find that her termination was either discriminatory or retaliatory.

B. Retaliatory Discharge

As articulated by the *Haulbrook* court, and assuming the Plaintiff's request for a reasonable accommodation was a protected activity, to make out a prima facie retaliation claim, Plaintiff must show that her employer fired her because she asked for an accommodation by producing evidence showing a that a causal connection existed between the adverse activity and the protected action. *Haulbrook*, 252 F.3d at 706 . For the same reasons Plaintiff can not show that she was terminated because of her disability, she can not show any causal connection between her request for accommodation and her termination: there is simply no evidence that Tucker knew of her requested accommodation at the time she decided to terminate her. Without this knowledge, there is no way to prove causal connection.

In *Haulbrook*, the Court found a termination and protected activity-a November 4 request for accommodation. *Id.* However, the Court found that any contested issue of fact that might arise "due solely to the proximity in time of his termination on November 25 and his assertion on November 4 of a right to accommodation under the ADA was "not material because the proffered legitimate reasons for his termination . . . was not rebutted effectively." *Id.* In the case at bar, the same result obtains. Regardless of whether Plaintiff's request for an accommodation constitutes a protected activity, a) arguably it came

after the decision to terminate, thereby rebutting any causal connection, and b) the proximity in time does not rebut the fact that voluminous evidence exists of Plaintiff's performance inadequacies, which evidence has not been shown to be rebuttable or pretextual.

### C.  Pretext

In either her discriminatory or retaliatory discharge case, Plaintiff might be able to defeat summary judgment if she could both establish a prima facie case AND show that Defendant's legitimate nondiscriminatory reasons for the action were pretextual and untrue.  However, Plaintiff's evidence of pretext is thin, at best, and consists of her own opinion and speculation.  These have been held to be insufficient to meet Plaintiff's burden on summary judgment.  *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989)(plaintiff's "own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons"); *Evans v. Techs. Applications & Serv. Co.,*80 F.3d 954, 960 (4th Cir. 1996)(job performance widely recognized as legitimate, nondiscriminatory reasons).

In *Holland v. Washington Homes, Inc.*, 487 F.3d 208 (4th Cir. 2007), *cert. denied,* 552 U.S. 1102 (2008), the Court explained that a plaintiff can avoid summary judgment when the question comes down to pretext by showing, for example, "'that the employer's proffered explanation is unworthy of credence.'"  *Id.* at 214 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000)).  The Court cautioned that "judgment as a matter of law [in favor of defendant] may be appropriate if a 'plaintiff created only a weak issue of fact as to whether the employer's reasons were untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.'" *Id.* at 215 (quoting *Reeves*, 530 U.S. at 148).  "Thus, a key factor for courts to consider is 'the probative value of the proof that the employer's explanation is false.'"  *Id.*(quoting *Reeves,* 530 U.S. at 149).

In *Holland*, the plaintiff's evidence that the employer's proferred explanation was false was his denials that he threatened his employer.  The Court accepted those denials as true.  Likewise, in this case, Plaintiff denies she was sleeping, that she was counseled about her slowness at her microfilm duties, that she lied to the Clerk, that she made mistakes at the front counter, that she argued with her supervisors and

caused dissension among her co-workers, that she violated office policy for calling out sick, etc. The Court must accept those denials as true.

Nonetheless, in spite of Holland's denials that he threatened his supervisor, the Court found that nothing in the record showed that the employer's belief that Holland had threatened his supervisor was false. *Id.* at 215 ("nothing in the record supports an inference that [the employer's] explanation was pretextual, or perhaps more on point, that [the employer] did not believe that Holland had threatened [his supervisor] when [the employer] made the decision to fire [plaintiff]." Likewise, in this case, Plaintiff simply has no evidence to show that Tucker was lying when she fired Plaintiff for sleeping, slowness at her microfilm duties, lying to Tucker, arguing with her supervisors, causing dissension among her co-workers, violating office policy for calling out sick, etc. These myriad failings are well-documented in the record of depositions and affidavits and Plaintiff has no evidence that Tucker's reliance on them and her own observations was pretext for illegal discrimination or retaliation. *See, also, Ennis,* 53 F.3d at 60-61 (focusing on what relevant decisionmakers knew); *Henson v. Liggett Group, Inc.,* 61 F.3d 270, 276 (4th Cir. 1995)(perceptions on nondecisionmakers are of low probative value); *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir. 1980)("It is the perception of the decision maker which is relevant."). Thus, summary judgment is appropriate for Defendants on both issues.

## II. PLAINTIFF CAN NOT PROVE THAT SHE WAS WRONGFULLY DENIED A REASONABLE ACCOMMODATION.

In failure to accommodate claims, Plaintiff, in addition to showing that she is a qualified individual with a disability within the meaning of the statute, Plaintiff must show that her employer was aware of her disability, that with a reasonable accommodation she could perform the essential functions of her job, and that the employer still failed to reasonably accommodate her. *Rhoads v. FDIC,* 257 F.3d 373, 387 n.11 (4th Cir. 2001); *Hoffman v. Caterpillar, Inc.,* 256 F.3d 568, 572 (7th Cir. 2001). *See also Josey v. Wal-Mart,* 2012 U.S. Dist. LEXIS 49337, at 8 (D.S.C. 2012) (quoting *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387 (4th Cir. 2001)). As argued above, Plaintiff can not show that she is a qualified person with a disability as defined by the ADA. But even if she could, she can not prove either that her employer was aware of her disability or her requested accommodation nor that the requested

accommodation would have enabled her to perform the essential functions of her job, her failure to perform which led to her dismissal.

    A.  Plaintiff can not prove she adequately put her employer on notice of her disability or her requested accommodation.

The relevant question is whether Plaintiff's employer knew of her disability when the events giving rise to the failure to reasonably accommodate claim arose. *See Fleetwood v. Harford Sys.*, 2005 U.S. Dist. LEXIS 2993, at 32 (D. Md. 2005). . The Middle District has noted that an employer has an "mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations" only after an employer becomes aware of the existence of a disability and the need for an accommodation. *EEOC v. Dollar Gen. Corp.*, 252 F. Supp at 283. In this case, the decision to terminate Plaintiff had been made prior to the decision maker learning of her desire for a change in job duties. *Accord Reed v. Lepage Bakeries, Inc.*, 244 F.3d 254, 260-261 (1st Cir. 2001)( "[t]he ADA imposes liability on an employer for 'not making reasonable accommodations to the ***known*** physical or mental limitations' of an employee." ) (emphasis in original)

"Because an employee's disability and concomitant need for accommodation are often not known to the employer until the employee requests an accommodation, the ADA's reasonable accommodation requirement usually does not apply unless 'triggered by a request' from the employee." *Id.* (citation omitted)). At the very least, "[t]he employee's request must be 'sufficiently direct and specific," giving notice that she needs a 'special accommodation'." *Id.* at 261. "The employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change in the workplace." *Id.* In this case, though Plaintiff says she put her employer on notice in May, in fact nothing she said even used the words "disability" or "accommodation" until her email in early September.

In *Reed*, the Court found that the employee had completely failed to put the employer on notice that she had a disability needing a special accommodation of being able to walk away from co-workers in order to go get a supervisor when involved in a conflict where she felt that her psychological ability to control her rage might result in unacceptable work conduct. "The only hint [plaintiff] gave of any disability was a vague reference to her therapist, who on earlier occasions had sent notes to [the

employer] indicating that [plaintiff] was being seen for depression." *Id.* at 262. The Court found that the reason the plaintiff was fired had nothing to do with her requested accommodation, even assuming that the employer had known she had a disability, and upheld summary judgment in favor of the employer.

In *Reed,* the plaintiff fell into a rage after a machine broke down during her shift and was unrepairable. She and her supervisor agreed that in the future when she felt aggravated, she should walk away from a situation and not stay and have words with a co-worker. A year later, while having a conversation with her supervisor and an HR employee about when she was going to return to work from a worker's compensation injury, Reed flew into a rage with her supervisor, dared her to fire her, used profanity towards her, and threatened to sue her supervisor if she was fired. Having lost control of herself, she was escorted from the building and was terminated the next day. *Id.*

Reed subsequently sued, alleging that she had been discriminated against because of her disability of mental illness and that had she been accommodated by being allowed to walk away from the situation with her supervisor that she would not have been fired. After a lengthy discussion of the relative burdens on plaintiffs and defendants in reasonable accommodation cases, the Court concluded that the relative burdens did not arise in Reed's case because Reed had failed to prove that "she ever sufficiently requested the accommodation in question." The Court explained:

> This is the fatal flaw in Reed's case. Specifically, Reed never made LePage sufficiently aware that she had a disability marked by occasional fits of rage and consequently needed some sort of *special* accommodation. . . . These grounds suffice to dispose of her case.

244 F.3d at 260.

In this case, taking Plaintiff's version of the facts as true and also considering the undisputed testimony offered by Defendants' witnesses, the first possible moment that the Defendants could have gotten any inkling whatsoever that Plaintiff had a disability was in May, 2009 when Plaintiff told Excel, her immediate supervisor, that she was having trouble with her medicine and had gotten a previous diagnosis of some condition in May of 2009. Plaintiff made no mention of the condition being a disability at this time and did not indicate that she needed any special considerations. And thereafter, Plaintiff struggled to adequately perform at work.

Deficiencies in Plaintiff's work performance, consisting of *inter alia* conflicts with co-workers, slowness in performing microfilm duties, perceived lying to Tucker, putting her head down on her desk appearing to be asleep while at work, and various other qualitative shortcomings in her performance continued to occur between this time and the end of September when she was terminated. Only on September 8, while Tucker was out on vacation and then sick leave, did Plaintiff approach any of her supervisors about restructuring her job to not work the front counter. Plaintiff did not disclose that she had a "disability" until this time, when she communicated via email to Excel, Griffin, and Kennedy while Tucker was on leave, that she had a "disability" and was requesting an "accommodation." Plaintiff did not forward the request to Tucker until two days later, and the undisputed testimony is that Tucker had no knowledge of Plaintiff's "disability" until after the time she decided to terminate Plaintiff. This conclusion is supported by not only Plaintiff's own surreptitious tape-recording of Tucker, but Plaintiff's own deposition testimony and Tucker's deposition testimony.

Such evidence establishes that Tucker was neither aware that Plaintiff was asserting a disability and requesting an accommodation, or that she had an affirmative duty to engage in a dialogue with Plaintiff about whether eliminating her front counter duties would have been a reasonable accommodation and whether that would have improved her job performance to the extent that Tucker might not have terminated her. Tucker knew that she was not terminating Plaintiff for her work solely at the front counter, but for *inter alia* the sleeping, being inefficient at performing her microfilm duties, and contentiousness that had nothing to do with working at the front counter.

B. Plaintiff can not show that her requested accommodation would have enabled her to perform the essential elements of her job.

However, even if she had a disability recognized by the ADA, and she could show that she had notified her employer that she had a disability, her claim would fail because she has no evidence to show that her requested, and assuming *arguendo,* reasonable accommodation, would enable her to be able to perform the essential functions of her job that she was ultimately terminated for being unable to perform, that is, staying alert, performing her work in a timely manner, and getting along with her co-workers.

A reasonable accommodation is one which "enable[s] an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(i) (2012). As discussed above, Plaintiff was unable to perform the essential functions of her position, evidenced by her inability to efficiently scan court filing into microfilm, her inability to refrain from socializing with others in order to staff the front counter, and her inability to stay awake while on the job. Plaintiff's performance problems would not be remedied by any sort of reasonable accommodation along the lines of the one requested by her, and so her claim fails.

Although Plaintiff contends that her work performance would have improved if her job had been restructured so that she did not have to work the front counter, there is no evidence that this is true. Her difficulties dealing with the public were but one part of her overall performance deficiencies which resulted in her termination. Her slowness in performing her microfilm duties, her conflicts with co-workers, her perceived lying to her supervisor, and sleeping at work all would not have been remedied and may have been exacerbated by a job restructuring to give her more time microfilming and away from the front counter.

Under the ADA, reasonable accommodations can include "job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B) (2012). However, the Fourth Circuit has made it clear that employers are not required to "reallocate essential job functions," and "an accommodation that would require other employees to work harder is unreasonable." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 Fed. Appx. 314, 323 (4th Cir. 2011) (quoting *Crabill v. Charlotte-Mecklenburg Bd. of Educ.*, 708 F. Supp 2d 542, 556 (W.D.N.C. 2010)). *Accord White*, 45 F.3d at 362 ("[T]he ADA does not require an employer to promote a disabled employee as an accommodation, nor must an employer reassign the employee to an occupied position, nor must the employer create a new position to accommodate the disabled worker.")

In this case, Plaintiff's requested accommodation was that she not be scheduled to work at the front counter. Working at the front counter and responding to public inquiries are essential functions of the position. As essential functions of Plaintiff's job, Plaintiff's requested accommodation constitutes a

reallocation of essential job functions and as such is unreasonable.  *See, e.g. Stafford v. Radford Community Hosp.*, 1996 U.S. Dist. LEXIS  523, at 7-10 (W.D. Va. 1996) (explaining that, because lifting is an essential function of Plaintiff's position, and her injury prohibits her from lifting, an accommodation that would enable her to refrain from lifting would be reasonable); *see also Hall v. United States Postal Service*, 857 F.2d 1073, 1078 (6th Cir. 1998) ("An employer, including a federal employer, is not required to accommodate a handicapped individual by eliminating one of the essential functions of the job."). Additionally, this accommodation would require other employees to cover the front counter, presumably in addition to their regular responsibilities given the hiring freeze imposed upon the office.  This accommodation is unreasonable given the workload within the Clerk's office, which was particularly high due to budget cuts within the office, because it would require other employees to work harder or longer hours.  *See, e.g. Dicksey v. New Hanover County Sheriff's Dep't.*, 522 F. Supp 2d 742, 748-49 (explaining that the Plaintiff's requested accommodation, working only day shifts at the front desk (rather than rotating days and nights) was unreasonable because it would require Plaintiff's coworkers or boss to cover his night shifts, which would limit the flexibility of the front desk position and would "hamper the unit's ability to handle staffing shortages").

Thus, it is abundantly clear that Plaintiff's claim would fail on the fourth prong of the test, even if it satisfied all others.  First of all, Plaintiff's employer never refused to make an accommodation for Plaintiff; instead, as noted above, Tucker terminated Plaintiff before even being aware of a request for accommodation.  Because of this, it cannot be said that Plaintiff's employer refused her accommodation or refused to engage in the interactive process.  However, "the interactive process the ADA foresees is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position sought." *Rehling v. City of Chicago*, 207 F.3d 1009 , 1015 (7th Cir. 2000) (quoting *Sieberns v. Wal-Mart Stores, Inc*., 125 F.3d 1019, 1023 (7th Cir. 1997)).

In *Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128 (9th Cir. 2001), the Court found that an employer's refusal to allow an employee medical transcriptionist to work at home as a reasonable

accommodation was unreasonable where other employees were allowed to do so given that she was terminated for her excessive absenteeism. The Court noted that "[t]he link between the disability and termination is particularly strong where it is the employer's failure to reasonable accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability." *Id.* at 1140. In the case at bar, even assuming the employer knew of the disability, there is no link between Plaintiff's performance issues and her working at the front desk. In fact, the most egregious failings, sleeping on the job and being slow at microfiche duties, occurred away from the front desk. Eliminating her front desk work would only have exacerbated her performance problems in these areas.

Furthermore, it cannot be said that Plaintiff was fired in retaliation for requesting a reasonable accommodation. It seems that Plaintiff conflates a failure to accommodate claim with a wrongful discharge claim by alleging that she was fired "in order to avoid providing a reasonable accommodation." The court has specifically held that these claims are separate, and a theory for a failure to provide reasonable accommodation claim that is premised on the fact of termination must fail. *See Ainsworth v. Loudon Co. Sch. Bd.*, 851 F. Supp 2d 963, 980-81 (E.D. Va. 2012) (citing *Vlasek v. Wal-Mart Stores, Inc.*, No. H-07-0386, 2007 U.S. Dist. LEXIS 60933, at 5 (S.D. Tx. Aug. 20, 2007) ("It is generally accepted that a failure to accommodate is not like or reasonably related to an allegation of termination.") (collecting cases)).

Moreover, an employer's failure to engage in an interactive process does not preclude summary judgment where the employee cannot show that her proposed accommodation was a reasonable one. *See Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997)(rejecting a failure to investigate claim where no reasonable accommodation could have been made). In this case, Plaintiff was terminated *inter alia* for sleeping on the job, being slow at microfilm duties, arguing with her co-workers and supervisors, etc. None of these performance problems, especially the sleeping and the microfiche duties, which occurred while she was alone and not interacting with other people, would have been cured by the elimination or reduction of her front desk duties. Thus, that proposed accommodation was not a reasonable one and Defendants in this case can not be faulted for not engaging in an interactive process after the decision had

already been made to terminate her.

## **CONCLUSION**

The evidence shows that there are no material issues of disputed fact and that defendants are

entitled to judgment as a matter of law.

Respectfully submitted, this the 31st day of October, 2012.

ROY COOPER
Attorney General

/s/ Valerie L. Bateman
Special Deputy Attorney General
North Carolina State Bar No. 13417
Email: vbatemen@ncdoj.gov

/s/ Kathryn Shields
Associate Attorney
North Carolina State Bar No. 43200
Email: kshields@ncdoj.gov

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Telephone: (919) 716-6800
Facsimile: (919) 716-6755
Attorneys for Defendants

**CERTIFICATE OF FILING AND SERVICE**

This is to certify that the undersigned has this day electronically filed the foregoing MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel for the plaintiff, Vanessa K. Lucas, Lisa Grafstein, and A. Mercedes Restucha-Klem.

Vanessa K. Lucas
N.C. State Bar No. 33582
Edelstein & Payne
Post Office Box 28186
Raleigh, N.C. 27611
Telephone: 919-828-1456
Fax: 919-828-4869
vanessa@edelsteinpayne.com

Lisa Grafstein
N.C. State Bar No. 22076
lisa.grafstein@disabilityrightsnc.org
A. Mercedes Restucha-Klem
N.C. State Bar No. 40018
mercedes.restucha@disabilityrightsnc.org
Disability Rights North Carolina
2626 Glenwood Ave., Suite 550
Raleigh, N.C. 27608
Telephone: 919-856-2195
Fax: 919-856-2424

This the 31st day of October, 2012.

/s/ Valerie L. Bateman.
Special Deputy Attorney General

/s/ Kathryn H. Shields
Associate Attorney