IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CIVIL ACTION NO. 7:11 CV 169 BO

| | | |
|---|---|---|
| CHRISTINA LYNN JACOBS, | ) | |
| Plaintiff, | ) | **PLAINTIFF'S MEMORANDUM IN** |
| | ) | **OPPOSITION TO DEFENDANTS'** |
| v. | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| N.C. ADMINISTRATIVE OFFICE | ) | |
| OF THE COURTS, and JAN KENNEDY | ) | |
| in her official capacity as | ) | |
| NEW HANOVER COUNTY | ) | |
| CLERK OF SUPERIOR COURT, | ) | |
| Defendants. | ) | |

## INTRODUCTION

On May 5, 2009, Christina Jacobs told her supervisor, Debra Excell, about her concern that working at the front counter at the Clerk's office was causing her to experience increased symptoms of her social anxiety disorder. Ms. Excell reported this conversation to Brenda Tucker, the New Hanover County Clerk of Court. On May 5, 2009, Ms. Tucker wrote a note for Ms. Jacobs' personnel file reflecting her conversation with Ms. Excell using the phrases "too stressful," "dreading coming to work," "nerve issue," and "**anxiety disorder**." She noted: "might have to go back to Dr. worried may be a problem and don't want to reflect badly." Ms. Tucker gave the note to her assistant, who placed Ms. Jacobs' name on it, dated it, and placed it in Ms. Jacobs' personnel file.

At Ms. Excell's urging, Ms. Jacobs continued to try to manage her symptoms rather than return to her prior position. Ms. Jacobs concluded in September 2009 that she again needed to request an adjustment to her work. She sent her supervisors and Ms. Tucker an email with the subject line "Front Counter Accommodation," again specifically referencing her social anxiety disorder. Ms. Jacobs' supervisor told her that her request would not be acted on until Ms. Tucker returned from time off. On the day Ms. Tucker returned, Ms. Jacobs was fired.

Defendants have offered various and differing rationales for the termination, which have evolved over time and are not supported by contemporaneous documentation.

1

## STATEMENT OF THE FACTS

On January 7, 2009, Ms. Jacobs began working as an Office Assistant in the Criminal Division of the New Hanover County Clerk's Office. (Jacobs Dep. 49:13-15, Aug. 15, 2012). Ms. Jacobs was hired by Brenda Tucker, who was at that time the New Hanover County Clerk of Superior Court. (Tucker Dep. 35:2-36:7, June 19, 2012). As an Office Assistant, Ms. Jacobs was responsible for microfilming and filing. (Jacobs Dep.45:5; Kennedy Dep. 40:16-17, June 18, 2012). Contact with the public was not a requirement of the job of Office Assistant. (Tucker Dep. 40:13-25, 41:1-2; Kennedy Dep. p. 44:19-25, 45:1-3; English Dep. 16:3-10) Ms. Jacobs received a promotion to Deputy Clerk on February 3, 2009. (Jacobs Dep. 56:11-12; Tucker Dep. 41:11-21; Tucker Dep. Ex. 17, Doc. 54 at 69[1]). At first her duties remained the same, but on or about March 2009, Ms Jacobs began working at the front counter in addition to her duties of microfilming and filing. (Jacobs Dep. 57:18, 59:11-21; Tucker Dep. 44:6-12, 51:8-13).

In her position at the front counter, Ms. Jacobs was responsible for helping the public. (Kennedy Dep. 23:18, 80:17; English Dep. 16:9, 19:4-11, Aug. 21, 2012). Ms. Jacobs was supervised by Jan Kennedy, Debra Excell and Melissa Griffin. (Radewicz Dep. 36:6-7, June 18, 2012; Griffin Dep. 30:22-31:19; Excell Dep. 21:23-25, June 19, 2012; Tucker Dep. 24:9-11; Kennedy Dep. 49:9-10). Ms. Jacobs was trained on the front counter and Office Assistant duties by Ashley English. (Jacobs Dep. 57:8-9; English Dep. 57:20). Ms. English had only been a Deputy Clerk for a few months when she trained Ms. Jacobs. (Tucker Dep. 71:15-73:14; Tucker Dep. Ex 18, Doc. 54 at 70; English Dep. 20:19-21:2). Ms. English never received training to be a trainer. (English Dep. 58:4-5). Ms. Jacobs watched and took notes while Ms. English performed the front desk duties for about a week and then Ms. Jacobs took over the duties. (Jacobs Dep. 57:16-18, 76:19-77:8). Ms. English and Ms. Jacobs only covered a small percentage of what could happen at the front desk during that week. (Jacobs Dep. 77:11-14).

At the front counter, there could be many different situations for the Deputy Clerk to handle. (Excell Dep. 24:17-21). A Deputy Clerk could never know the answer to every question that could be

---

[1] The exhibits to the depositions of English, Excell, Griffin, Jacobs, Kennedy, Radewicz and Tucker are cited to within referencing both the Deposition Exhibit (Dep. Ex.) number and the Document (Doc.) number from the case file that was assigned when they were filed by Defendants.

2

asked. (English Dep. 19:17). Not every question that the public asked would have serious consequences if answered incorrectly, but the nature of the work in the Criminal Division meant that errors could have serious consequences. (Excell Dep. 106:6-23). Although Ms. Jacobs enjoyed working at the front counter, the weight of not knowing the response to every question and the importance of getting the responses correct caused Ms. Jacobs to experience some of the more severe symptoms of her social anxiety disorder. (Jacobs Dep. 61:12-13, 83:15-19, 219:7-221:1).

On or about May 5, 2009, Ms. Jacobs went to her supervisor Ms. Excell and told her that she had social anxiety disorder and was not feeling healthy at the front counter. Ms. Jacobs shared that she was concerned about it reflecting badly if people saw that she was nervous. Ms. Jacobs asked Ms. Excell about returning to the Office Assistant position. Ms. Excell encouraged Ms. Jacobs to continue with the job at the front counter, as she was improving. She said that everyone has the same concerns at the front counter, especially when they are new. Ms. Jacobs shared with Ms. Excell that she might have to go back to the doctor and try medications that she had used in the past. Ms. Excell encouraged her to do so. (Jacobs Dep. 82:19-84:13, 160:22-161:15; Excell Dep. 45:3-46:15).

Ms. Jacobs went to Masonboro Family Medicine on May 26, 2009 about her concerns over the symptoms she was experiencing since she began working at the front desk. (Jacobs Dep. pp 87:7-8, 124:9-125:12). Ms. Jacobs was prescribed Lexapro. She was switched to Prozac at her follow up visit on June 30, 2009. (Jacobs Dep. 124:9-130:24; Jacobs Sealed Dep. Ex. 35, Doc. 61 at 2-4).

Because she was still having difficulty managing her disability while working at the front counter, on September 8, 2009 Ms. Jacobs sent an email to her three supervisors with the subject line "Front Counter Accommodation." (Pl. Ex. 1) Ms. Jacobs wrote:

> As I mentioned briefly since I began my employment here, I was diagnosed with Social Anxiety Disorder, which often limits my ability to perform under stress.
>
> Since beginning work at the front counter in March 2009, I have been doing my best with what I have been given. I have spoken with my doctor about my condition worsening under the pressure of my new job and have been trying different medications that should allow me to better handle stress. In spite of the medications, however, I am still having difficulty managing my condition at the front counter.

3

(Id). Ms. Jacobs did not ask to be taken completely off the front counter, but to work with the Clerk's Office to adjust her role within the office. (Id). She concluded: "Under the circumstances of my disability, I need to do whatever I can to accommodate so that I can continue to contribute to the successfulness of the Clerk's Office." (Id).

On September 9, 2009, Ms. Jacobs went to supervisor Jan Kennedy to follow up on her email. (Jacobs Dep. 165:24-166:5). Ms. Kennedy told Ms. Jacobs that Ms. Jacobs would have to wait until Ms. Tucker returned to the office. (Jacobs Dep. 166:6-9; Kennedy Dep. 90:13-91:1). Ms. Jacobs forwarded the accommodation request to Ms. Tucker. (Jacobs Dep. 165:14-17; Pl. Ex. 6). When Ms. Tucker returned to the office on September 29, 2009, Ms. Jacobs saw her in the break room and asked to meet with her. (Jacobs Dep. 166:18-167:6) Ms. Jacobs was called into Ms. Tucker's office later that day and Ms. Tucker fired her. (Jacobs Dep. 168:16-18; Tucker Dep. 93:12-95:4).

**Plaintiff's Disability.** Ms. Jacobs suffers from social anxiety disorder. Ms. Jacobs was diagnosed with social anxiety disorder by Judith Lipchin, her family doctor. (Jacobs Dep. 148:16-18; Jacobs Sealed Dep. Ex. 35, Doc. 64 at 8). Dr. Claudia Coleman recently examined Ms. Jacobs and found that "Ms. Jacobs does suffer from a mental disorder that substantially limits one or more major life activities, such as Ms. Jacobs' capacity to communicate with and interact with others in a wide range of situations, both socially and occupationally." (Pl. Ex. 2, Att. 1 at 6). Dr. Coleman diagnosed Ms. Jacobs with Social Phobia (Social Anxiety Disorder), Generalized Type Anxiety Disorder, NOS, with panic attack and agoraphobia and Dysthymia. (Id). Dr. Coleman's report and declaration are based upon not only a review of documents, but upon in-person examination and testing of Ms. Jacobs. (Pl. Ex. 2. ¶ 4; Pl. Ex. 2, Att. 1 at 1). Dr. Coleman also reports that Ms. Jacobs medical records indicate that Ms. Jacobs has had significant difficulties with anxiety since she was quite young, pointing to a psychological report from when Plaintiff was 10-years-old. (Pl. Ex. 2, Att. 1 at 2; Pl. Ex. 3)

Social anxiety disorder does not entail a lack of desire for social interaction. Rather, the condition can cause extraordinary stress in interactions with others. Dr. Coleman reported that "[Ms.

4

Jacobs] noted that while she essentially was withdrawn due to her social fears, she wanted to have relationships with others." (Pl. Ex. 2, Att. 1 at 3). In Ms. Jacobs' case, the anxiety stems in significant part from being in circumstances where she has unclear direction or guidance. "She experienced intense anxiety when asked questions she was unable to answer or had duties she felt untrained to do and also had intense anticipatory anxiety that was present even when not actually confronted by these situations." (Pl. Ex. 2, Att. 1 at 6-7).

Ms. Jacobs sought treatment while she was in college for the disorder. (Jacobs Dep. 148:13-149:7, 217:14-20; Pl. Ex. 4 ¶ 3). Ms. Jacobs started experiencing symptoms that she recognized as being related to her social anxiety disorder when she began working at the front desk. (Jacobs Dep. 225:15-227:1; Ex. 4 ¶ 5). The symptoms Ms. Jacobs experienced included finding it hard to breath, a racing heart, having trouble catching her breath and calming her body down. Her body would shake, she would have random crying spells and feelings of sudden dread. She experienced extreme stress, bouts of nervousness and panic attacks. (Jacobs Dep. 219:12-221:1, 225:15-226:1; Am. Compl. ¶ 11). The symptoms got severe enough that Ms. Jacobs sought medical treatment for them in May of 2009. (Jacobs Dep. 124:22-125:20; Jacobs Sealed Dep. Ex. 35, Doc. 61 at 2-4).

Ms. Jacobs' disability denies her the benefits of a social life, having close friends, and intimate relationships. (Jacobs Dep. 254:3-6). Interacting with others is very overwhelming for Ms. Jacobs. (Jacobs Dep. 218:21-219:6). Ms. Jacobs starts to feel sick in situations in which others would have no fear. (Id.) Since Ms. Jacobs was a child, she has had problems falling asleep and staying asleep because she is panicking, especially if she is nervous about something happening the next day or even in a week or month. (Jacobs Dep. 249:13-16; Pl. Ex. 4 ¶ 9). Ms. Jacobs loses her appetite and she has trouble eating. (Id). If something makes her particularly nervous, she will not be able to eat and will often go a day or two without eating. (Jacobs 249:23-24, 253:21-22).

**Defendants' Knowledge of Plaintiff's Disability and Request for Accommodations.** On or about May 5, 2009, Ms. Jacobs told her supervisor Ms. Excell that she had social anxiety disorder. She mentioned she was worried that her symptoms were getting in the way and she did not want it to reflect

poorly. She told Ms. Excell that she was having panic attacks and felt that she was too nervous at the front desk. Ms. Jacobs let Ms. Excell know that she might have to go back to the doctor and perhaps try medications. Ms. Jacobs also asked if she could to go back to the Office Assistant position because of the difficulties she was experiencing managing her symptoms. (Jacobs Dep. 82:19-84:10, 160:22-161:15; Excell Dep. 45:3-46:15; Pl. Ex. 4 ¶ 6; Doc. 40-5, Def. Ex. F to Corvin Affidavit at 20).

Ms. Excell spoke with Ms. Tucker about her conversation with Ms. Jacobs. (Tucker Dep. 75:2-14; Excell Dep. 50:8-23). Ms. Tucker made notes of that conversation, which were placed in Ms. Jacobs' personnel file. Ms. Tucker's notes recorded that it was "too stressful" and Ms. Jacobs "dreading coming to work;" "nerve issue" and "anxiety disorder" were specifically noted. The note ended that Ms. Jacobs "might have to go back to Dr. worried may be a problem and don't want to reflect badly." (Tucker Dep. 75:21-25; Pl. Ex. 5). Ms. Tucker's assistant, Alice Radewicz, added the date and Ms. Jacobs' name to the note and placed it in Ms. Jacobs' personnel file. (Radewicz Dep. 43:18-45:5; Pl. Ex. 5).

On September 8, 2009, Ms. Jacobs wrote to all three supervisors regarding a "Front Counter Accommodation." She requested to be assigned to the front counter less frequently and trained on the other duties of a deputy clerk. Ms. Jacobs let the supervisors know that she had spoken to her doctor about her condition worsening under the pressure of her new job. She mentioned she was trying different medications that should better allow her to handle the stress, but that she was still having difficulty managing her condition at the front counter. She closed by stating that "under the circumstances of my disability, I need to do whatever I can to accommodate so I can continue to contribute to the successfulness of the Clerk's Office." (Pl. Ex. 1).

Ms. Kennedy file stamped the email on September 9, 2009, because she considered it as a request to be moved and she thought it was important. (Kennedy Dep. 96:14-16; Pl. Ex. 1). Although Ms. Kennedy, Ms. Excell, and Ms. Griffin had the authority to, and regularly did, make assignment changes, Ms. Kennedy told Ms. Jacobs that the matter needed to be handled by Ms. Tucker. (Jacobs Dep. 165:14-166:19; Kennedy Dep. 90:16-92:5; Radewicz Dep. 60:16-61:8; Tucker Dep. 50:18-51:7). As a result, Ms. Jacobs forwarded the email to Ms. Tucker on September 9, 2009 and indicated that she would come

6

by Ms. Tucker's office to discuss it when Ms. Tucker returned to the office. (Jacobs Dep. 165; Pl. Ex. 6).

On September 29, 2009, Ms. Jacobs was called in to Ms. Tucker's office. When she came in, Ms. Jacobs saw a copy of her accommodation request, with Ms. Tucker's handwritten notes on it, on Ms. Tucker's desk. (Jacobs Dep. 236:9-11, 239:20-21; Pl. Ex. 6).

**Plaintiff is a Qualified Individual.** The education requirement for a deputy clerk position is a high school diploma. (Tucker Dep. 186:11-13). Ms. Jacobs is a graduate of the University of North Carolina at Wilmington (UNC-W) where she majored in English and Criminal Justice with a grade point average of 3.1258. (Jacobs Dep. 19:19; Jacobs Dep. Ex 24, Doc. 55 at 1-2). Ms. Jacobs was quickly promoted to a Deputy Clerk after serving only one month as an Office Assistant. (Tucker Dep. 42:2-4; Tucker Dep. Ex 17, Doc. 54 at 69). At first her duties were the same, but as of March 2009, Ms. Jacobs' duties as Deputy Clerk were to provide customer service at the front counter, perform data entry, and assist court personnel and the public, along with her previous office assistant duties. (Jacobs Dep. 56:17-18; Kennedy Dep. Ex. 7 at 12-13, Doc. 54 at 37-38). Ms. Jacobs' schedule consisted of working four days at the front counter and one day microfilming. (Jacobs Dep. 99:8-12). Ms. English, Ms. Jacob's trainer, thought that Ms. Jacobs was doing fine when she trained her. (English Dep. 62:2-4). Ms. English also testified that she thought Ms. Jacobs performance as an office assistant, microfilming and filing, was fine and did not hear complaints about her. (English Dep. 63:3-8). Ms. English never had any discussions with the supervisors, co-workers or Ms. Tucker about Ms. Jacobs' job performance. (English Dep. 66:10-67:5). Ms. Jacobs' supervisors never counseled her on job performance. (Jacobs Dep. 91:11-17).

Ms. Jacobs worked at the front counter for nearly seven months. She was never relieved of her duties there in regard to any concern about the quality of her work. During her employment, Ms. Jacobs was never written up for anything. (Tucker Dep. 139:10) Her personnel file does not contain any notes critical of her performance. Ms. Jacobs was a qualified individual and was satisfactorily performing her job duties. (Jacobs Dep. 240:7-241:10; Pl. Ex. 4 ¶ 15).

**Plaintiff's Discharge.** Ms. Tucker returned to the office on September 29, 2009, after being out several weeks. (Jacobs Dep. 166:13-23; Tucker Dep. 93:12-17). Ms. Jacobs saw Ms. Tucker in the break

room and asked if they could meet. (Jacobs Dep. 166:13-167:10). Later, Ms. Tucker called Ms. Jacobs into her office. When Ms. Jacobs arrived all three of the supervisors were already in Ms. Tucker's office. (Jacobs Dep. 167:22-23; Tucker Dep. 93:20-25; Kennedy Dep. 141:18-23) Ms. Jacobs could see her accommodation request, with handwritten notes on it, on Ms. Tucker's desk. (Jacobs Dep. 239:20-21; Pl. Ex. 6). Ms. Tucker started by saying to Ms. Jacobs, "I was meaning to talk to you also, but I'll let you go first." (Pl. Ex. 7; Pl. Ex. 8) Ms. Jacobs began to state that she wanted to talk about what she said in the email, and her request for an accommodation. (Id). Ms. Tucker clarified that what Ms. Jacobs wanted was to be moved from the front counter. (Id). Ms. Tucker's response was that she had two things to tell Ms. Jacobs. First, that she had told her in the interview what the job was like and that Ms. Jacobs had told her that it wouldn't be problematic for her. (Id). Ms. Jacobs responded that she did not think that it would. (Id). Ms. Tucker then told Ms. Jacobs that she was not "getting it" and there was nowhere to move Ms. Jacobs. (Id). Ms. Tucker then told Ms. Jacobs that she was terminating Ms. Jacobs' employment. (Id).

**Facts Related to Pretext.** Ms. Jacobs' personnel file does not reflect the performance issues raised by Defendants in this case. Ms. Tucker testified that she wrote notes on Ms. Jacobs' email requesting an accommodation after Ms. Jacobs was terminated, <u>so that she could explain the termination at some point in time.</u> (Tucker Dep. 121:7-8). Those notes do not contain any of the reasons that Defendants have since given for Ms. Jacobs' termination. The notes relate to Ms. Jacobs' disclosure of her social anxiety disorder, the days Ms. Jacobs missed from work after Ms. Jacobs asked for an accommodation, the Clerk's contention that Ms. Jacobs had been offered the Office Assistant position previously and refused, and an allegation that Ms. Jacobs "lied in the beginning" with reference to the contention that the front counter had been explained to her and she had indicated she could perform the work. (Tucker Dep. 111:5-121:8, Pl. Ex. 6).

Ms. Kennedy kept notes in her office that were separate from employee personnel files. Ms. Kennedy had notes about Ms. Jacobs. (Kennedy Dep. 96:3-97:15). Two of the notes were from May 2009. The note from May 6, 2009, referred to Ms. Jacobs asking to go home as she was feeling sick. Another note in May refers to explaining search warrants to Ms. Jacobs. A note from September 3, 2009

8

refers to Ms. Jacobs and Ms. Kennedy discussing probation violations and Ms. Kennedy's email concerning the same. There are no additional notes until after Ms. Jacobs requested an accommodation. Then, on September 10, 2009, Ms. Kennedy noted talking with Ms. Jacobs over requesting leave and the final note dated September 29, 2009 followed the meeting where Ms. Jacobs was terminated. (Kennedy Dep. 100:12-108:13; Kennedy Dep. Ex. 2, Doc. 54 at 4-8). Ms. Kennedy did not have any notes about outbursts, sleeping, counseling over asking questions, causing dissension, lying, or being argumentative. (Id). While these are reasons Defendants put forth after the initiation of an EEOC investigation, they were not reasons given during Ms. Jacobs' termination meeting or documented in her personnel file.

The only other note Ms. Tucker made, besides those taken on the email requesting an accommodation, was in reference to Ms. Jacobs' disability. (Pl. Ex. 5). Ms. Tucker did not recall keeping any other notes about Ms. Jacobs and none were in Ms. Jacobs' personnel file or other documents turned over during discovery. (Tucker Dep. 202:9-203:16).

Ms. Tucker testified that she relied on Ms. Griffin's opinion in terminating Ms. Jacobs. (Tucker Dep. 94:2-95:4). Ms. Griffin had no notes regarding Ms. Jacobs' performance. In fact, Ms. Griffin testified that she did not have day-to-day supervision of Ms. Jacobs or first-hand knowledge regarding performance issues. (Griffin Dep. 37:10-23, 68:2-7, 71:6-73:3). There are no emails in the record regarding Ms. Jacobs' performance or any of the criticisms now leveled at Ms. Jacobs.

Ms. Tucker's first opportunity to explain Ms. Jacobs' termination was a letter to Administrative Office of the Courts ("AOC") Human Resources dated January 10, 2010. (Tucker Dep. Ex. 23, Doc. 54 at 85-87). Ms. Tucker's letter included a comment about reservations she had in hiring Ms. Jacobs due to her "mousiness." The letter also referenced complaints that Ms. Jacobs did not disclose her disability and a list of issues that, besides microfilming speed, had not been brought up in the termination meeting. (Id). When Ms. Tucker sent a similar letter to the Equal Employment Opportunity Commission in response to Ms. Jacobs' Charge of Discrimination, there was no reference to the issues that have been raised since then, including the allegation that Ms. Jacobs was found sleeping on the job or violating office policy for calling in sick. (Tucker Dep. Ex. 22, Doc. 54 at 81-84).

9

Plaintiff filed a timely Charge of Discrimination and received a favorable Determination from the EEOC. The U.S. Department of Justice Civil Rights Division issued Plaintiff a Right to Sue letter and Plaintiff filed suit in a timely manner. (Am. Compl. ¶ 6; Am. Ans. ¶ 6).

### ISSUES

Plaintiff has raised claims of wrongful discharge, retaliation, and failure to accommodate. Plaintiff's Second Claim for Relief alleges that Defendant violated the ADA by commingling medical information with Plaintiff's personnel file. Defendants do not refer to or dispute this claim in their Motion or Memorandum in support thereof. (Am. Compl. ¶ 36.)

### ARGUMENT

**I.       Summary Judgment Standard**

Summary judgment may be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). All facts must be viewed in the light most favorable to Plaintiff. *See United States v. Diebold*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).

On a summary judgment motion, a court must consider whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant. *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 352 (4th Cir. 2007). In so doing, a court does not weigh evidence or make credibility determinations. *Id.*

**II.       Plaintiff Was Discharged Because of Her Disability and Request for an Accommodation.**

To establish a claim for disability discrimination, "a plaintiff must prove by a preponderance of the evidence that (1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4)

her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F3d 55, 58 (4th Cir. 1995).

A.  Ms. Jacobs is an Individual with a Disability as Defined in the ADAAA.

The term "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities…" 42 U.S.C. § 12102(1)(A)-(C)  "Interacting with others" is a major life activity. 29 C.F.R. § 1630.2(i)(1)(i).  The definition of "disability" is to be construed in favor of broad coverage of individuals and the term "substantially limits" shall be interpreted consistent with the findings and purposes of the ADA Amendments Act of 2008.  42 U.S.C. § 12102(4)(A)(B).

"The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(iii). *See also* 29 C.F.R. Part 1630 App., § 1630.2(j)(1)(iii), 76 Fed. Reg. 16978, 17009 (Mar. 25, 2011); *Kravits v. Shinseki,* 2012 U.S. Dist. LEXIS 24039, 2012 WL 604169, at *17 (W.D. Pa. Feb. 24, 2012) ("Viewing the facts relevant to [plaintiff's back problems and fibromyalgia] in the light most favorable to him, and assessing those facts under the new, less searching analysis called for by the ADAAA, there is sufficient evidence to permit a reasonable jury to find that [plaintiff] has a disability."). "This construction is also intended to reinforce the general rule that civil rights statutes must be broadly construed to achieve their remedial purpose." 29 C.F.R. Part 1630 App., § 1630.1(c), 76 Fed. Reg. 16978, 17005 (Mar. 25, 2011).

Factors used to determine whether an individual is substantially limited in a major life activity include condition, manner, and duration in which the activity is performed.  29 C.F.R. § 1630.2(j)(4)(i). "Condition, manner, or duration may also suggest the amount of time or effort an individual has to expend when performing a major life activity because of the effects of an impairment, even if the

11

individual is able to achieve the same or similar result as someone without the impairment." 29 C.F.R. Part 1630 App., § 1630.2(j)(4), 76 Fed. Reg. 16978, 17012 (Mar. 25, 2011)."

There is ample medical evidence to support a jury's determination that Ms. Jacobs has social anxiety disorder and that it interferes with major life activities. Ms. Jacobs' medical records show a long history of anxiety. (Pl. Ex. 3; Jacobs Sealed Dep. Ex. 35, Docs. 61-64; Pl. Ex. 2, Att. 1 at 2). The report of Plaintiff's expert, Dr. Claudia Coleman, details Ms. Jacobs' substantial limitations with regard to her "capacity to communicate with and interact with others in a wide range of situations," particularly with regard to the conditions, manner and duration of social interaction. (Pl. Ex. 2, Att. 1 at 6). "[Ms. Jacobs] noted that she tries hard not to avoid people and limit herself, but still has overwhelming anxiety that leads to avoidance a lot of the times." (Pl. Ex. 2, Att. 1 at 4). "In college she passed her courses, but her social anxiety prevented her from socializing with peers in a typical fashion. She did not date. Currently, she describes herself as only having 'work friends.'" (Id). Ms. Jacobs could only recall one day in college where she went to the beach and ate dinner with some acquaintances. (Jacobs Dep. 32:19-33:22, 252:22-253:5). Ms. Jacobs does not participate regularly in Tae Kwon Do. (Jacobs Dep. 185:7-186:13).

Defendants' expert, Dr. Corvin, contends Ms. Jacobs is not an individual with a disability, but he did not conduct testing or examination of Plaintiff.[2] As Dr. Coleman notes, this significantly restricts Dr. Corvin's ability to assess Ms. Jacobs and the affect of her social anxiety disorder: "With respect to Ms. Jacobs, the direct observation/interview and test data were critical to the diagnosis of social phobia, as the findings of both were highly supportive of this diagnosis." (Pl. Ex. 2 ¶ 4).

Similarly, Defendants rely on contentions regarding what constitutes a disability based on improperly restrictive and outdated arguments. For example, Defendants and Dr. Corvin contend that Ms.

---

[2] Although Defendants complain that they did not have the opportunity to have Ms. Jacobs examined by their expert, Defendants made no motion for a medical exam of Ms. Jacobs. See Fed.R.Civ.P. 35 ("The order [for a mental examination] . . . may be made only on motion for good cause and notice to all parties and the person to be examined.") Although on two occasions, Ms. Jacobs, through counsel, proactively raised the issue of Defendants' request to conduct a voluntary medical exam, Defendants did not pursue the medical exam until the final week of discovery. (Pl. Ex. 9). At that time, Defendants were informed that Ms Jacobs could be made available to Defendants' expert, but only in Wilmington due to her work schedule. Defendants opted not to pursue a Rule 35 motion or to otherwise take advantage of the opportunity to conduct the medical evaluation.

Jacobs is not an individual with a disability because she is not completely incapable of interacting with others, uses Facebook, and carries on conversations at work. (Doc. 41, Corvin Report at 7; Def.'s Mot. Summ. J. 13, 20). The law, however, does not require a complete inability to engage in a major life activity: "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). *See also* 29 C.F.R. Part 1630 App., § 1630.2(j)(1)(ii), 76 Fed. Reg. 16978, 17008 (Mar. 25, 2011); *Molina v. DSI Renal, Inc.*, 840 F. Supp. 2d 984, 995 (W.D. Tex. Jan. 4, 2012) ("the fact that [Plaintiff] learned to work through her pain to continue performing her regular tasks does not necessarily preclude her from being considered disabled.)

In a recent Eastern District of North Carolina case, the Court noted that the plaintiff's episodic multiple sclerosis flare-ups could be found to be a disability under the ADAAA and noting the regulations require the trier of fact to "focus on how a major life activity is substantially limited, not on what an individual can do in spite of an impairment." *Feldman v. Law Enforcement Assocs. Corp.*, 779 F. Supp. 2d 472, 483-84 (E.D.N.C. 2011) (citing 29 C.F.R. § 1630.2(j)(4)(iii)).

While Defendants put a great deal of weight on Ms. Jacobs' very modest amount of Facebook usage (Doc. 40-2, Corvin Aff. Ex. A at 1-109), use of social media such as Facebook is common for individuals with social anxiety. (Pl. Ex. 2 ¶ 5). Facebook allows "the individual to obtain social interaction in a protected, non-threatening environment that is much less anxiety-laden than face-to-face interpersonal contact and wherein the individual has significantly more control over the interactions." (Id). Dr. Coleman confirms that Ms. Jacobs' use of Facebook is highly consistent with her diagnosis and her desire to try to overcome her social anxiety. (Id). Defendants' reliance on *Rose v. Springfield-Greene County Health Dep't* is misplaced because it is a pre-ADAAA district court case. 668 F.Supp.2d 1206 (W.D. Mo. 2009); *see also*, Feldman, *supra*, at 487 ("[A]ll of the cases cited by [defendant], even those cases decided after the effective date of the ADAAA, involved alleged discrimination that took place before the ADAAA went into effect. ... As a result, the cases cited by [defendant] carry little, if any, precedential weight with respect to the issue of whether the plaintiffs in this case were disabled under the

13

ADAAA.") Moreover, the analysis used in *Rose* in determining whether there is a substantial limitation includes as a factor the use of mitigating measures – an approach specifically rejected by the ADAAA. 42 U.S.C. § 12102(4)(E)(i); 29 C.F.R. §1630.2(j)(1)(vi).

Dr. Coleman reviewed the report and video surveillance made by the private investigator[3] and noted that the interaction with the private investigator does not alter Ms. Jacobs' diagnosis of Social Phobia; rather it supports Ms. Jacobs' report to Dr. Coleman of decreased anxiety over time at her current workplace compared with the Clerk's Office. (Pl. Ex. 2 ¶ 6, Pl. Ex. 2, Att. 1 at 6-7). The interaction itself reflects a very basic, professional exchange of straightforward information. (Pl. Ex. 10; Pl. Ex.11).

Defendants and Dr. Corvin wrongly emphasize that Plaintiff has not received treatment on an ongoing basis to manage her condition or mitigate its effects. Under the ADAAA, "the determination of whether or not an individual's impairment substantially limits a major life activity is unaffected by whether the individual chooses to forgo mitigating measures. For individuals who do not use a mitigating measure (including for example medication or reasonable accommodation that could alleviate the effects of an impairment), the availability of such measures has no bearing on whether the impairment substantially limits a major life activity." 29 C.F.R. Part 1630 App., § 1630.2(j)(1)(vi), 76 Fed. Reg. 16978, 17010 (Mar. 25, 2011)(emphasis added). The uncontradicted evidence is that Ms. Jacobs sought treatment in May 2009 precisely because the symptoms of her disorder were intensifying at work.

While the parties' respective experts disagree, Dr. Coleman was better able to assess Ms. Jacobs through testing and examination, and relied on the proper standard for determination of disability. At most, there is a classic dispute of fact as between expert opinions, necessitating resolution by a jury. There is ample evidence from which a jury could determine that Ms. Jacobs is an individual with a disability as defined in the ADAAA.

---

[3] Defendants' use of their private investigator's interactions with Ms. Jacobs is improper. The investigator, employed by Defendants, communicated directly with a party to this action without notice to her counsel. Such communication is improper. *See* Rule 4.2, N.C. Rules of Professional Conduct (governing communicating with represented parties); *see also* Fed.R.Civ.P. Rules 26, 30 (relating to the appropriate procedure for discovery, including the deposing of parties). Counsel for Plaintiff notified Defendants that Plaintiff objected to the use of information obtained in violation of the Rules of Professional Conduct and the Rules of Civil Procedure.

14

B. Ms. Jacobs Was Able to Perform the Essential Functions of Her Job

Defendants' argument, at bottom, is that Ms. Jacobs did not master the duties associated with working at the front counter. (Def.'s Mot. Summ. J. 18). The evidence, however, supports the conclusion that Ms. Jacobs was qualified for and was performing the duties of her position.

1. *Ms. Jacobs Possessed the Skills Necessary to Perform the Essential Functions of Her Job*

Ms. Jacobs testified that she was capable of, and was, performing her duties. (Jacobs Dep. 240:18-241:10). She has a Bachelors degree from UNC-W, while the position required only a high school diploma. (Tucker Dep. 186:13). She was promoted after a short period working for the Clerk's Office, during which she worked on microfilming. (Tucker Dep. 42:2; Tucker Dep. Ex. 17, Doc. 54 at 69). The work at the front counter involved interacting with the general public, but also court personnel, lawyers, probation officers, judges and law enforcement. (Pl. Ex. 4 ¶ 15). There is no documented record of any complaints from the customers of Ms. Jacobs' service at the front counter. When directly asked about customer complaints in the interrogatories, Defendants only mention one vague instance, which is without details and unsupported by the deposition testimony. (Kennedy Dep. Ex. 7 at 8, Doc. 54 at 33). None of the affidavits of former co-workers (all current employees of the Defendants) state any belief that Ms. Jacobs was not able to perform the essential functions of her job. Indeed, her second trainer, stated: "I never determined if she had the ability to perform her job duties." (Stewart Aff. ¶ 6). None of these co-workers indicate that they ever told management that they did not believe Ms. Jacobs was capable of performing the essential functions of her job. Her first trainer Ashley English testified that she did not talk with anyone about Ms. Jacobs' job performance. (English Dep. 66:7-67:5).

2. *Significant Evidence Rebuts Defendants' Contentions Regarding Performance*

The parties dispute the issue of Ms. Jacobs' performance. While Defendants contend that Ms. Jacobs relies only on her own testimony to support her position that she was performing the essential functions of her job, there is direct and circumstantial evidence supporting Ms. Jacobs' position. *Feldman v. Olin Corp.,* 692 F. 3d 748 (7th Cir. Aug. 27, 2012) (finding triable question as to whether overtime

work and rotating shifts are essential functions); *Keys v. City of Philadelphia*, 2005 U.S. Dist. LEXIS 30137, 17 Am. Disabilities Ca. (BNA) 714 (E.D. Pa. Nov. 29, 2005) ("Because the essential functions required...are genuine issues of material fact in this case, determining Defendant's assertion is appropriately left for a jury to determine).

First, the record is devoid of the type of evidence to be expected when a defendant raises performance issues. Defendants never conducted a performance review for Plaintiff or issued any performance warnings. (Jacobs Dep. 91:11-17; Tucker Dep. 139:22-140:12; Kennedy 83:12-23). There were no write-ups regarding Ms. Jacobs' performance. By contrast, Defendants did have a process for conducting performance reviews, and did issue performance discipline prior to terminating an employee for performance-based reasons. (Id). There are no emails, file notes, memos or any other contemporaneous documentation of any of the purported performance issues Defendants have raised. In short, nothing in Ms. Jacobs' personnel file indicates that Defendants considered her performance inadequate prior to her request for an accommodation.

Second, as detailed below regarding pretext in Section E, *infra*, Defendants' complaints about Ms. Jacobs' performance have changed over time. For example, the allegation that Ms. Jacobs was found sleeping at work was not mentioned at termination, in Ms. Tucker's letter to the AOC regarding the termination, the Defendants' response to the EEOC Charge, or the Answer or Amended Answer in this case. Similarly, Defendants submitted affidavits from former coworkers who make additional allegations not contained in Defendants' discovery responses, but do not allege that these individuals informed management about these allegations at any time prior to submitting their affidavits in this case. (Mathis Aff; Kennedy Dep. Ex. 7 at 1- 21, Doc. 54 at 26-46).

Third, Defendants have failed to show plausible links between purported observations of alleged performance problems and the decision to terminate. For example, Ms. Tucker claims she relied on Ms. Griffin's opinion in firing Ms. Jacobs. However, Ms. Griffin testified that she did not directly supervise Ms. Jacobs and that her knowledge of Ms. Jacobs' performance was not personal knowledge. (Griffin Dep. 31:5-33:12, 67:17-68:7). Similarly, When Ms. Jacobs' supervisors were questioned about who

16

informed them of specific performance issues the response was nearly always "I do not recall" or "Ashley English." (Excell Dep. 114:13-17; Kennedy Dep. 167:22-168:1). Ashley English testified that she did not talk to anyone about Ms. Jacobs' performance. (English Dep. 66-:10-67:5). Defendants have identified no timeline as to when the alleged performance problems happened in relation to the termination in September 2009, and supervisors could not say when events occurred other than reference to a meeting in early May 2009 that ended with Ms. Jacobs being assigned a new trainer. Moreover, Ms. Tucker's allegation that Ms. Radewicz informed her of Ms. Jacobs sleeping on the job is undermined by a troubling admission: Ms. Tucker and Ms. Radewicz spoke on the morning of Ms. Radewicz's deposition about the details of Ms. Radewicz's report of Ms. Jacobs sleeping on the job, with Ms. Radewicz relying on Ms. Tucker for the information. (Radewicz Dep. 9:11-10:10.) The development of the story regarding the sleeping allegation is critical to Defendants' case because Defendants contend that Ms. Tucker made the decision before returning from vacation. The dubious way in which these witnesses sought to establish this allegation should obviate any reliance on it.

Fourth, there are direct disputes of fact raised by Ms. Jacobs' testimony. For example, Ms. Jacobs testified that it took her a half day to one day to microfilm. (Jacobs Dep. 52:25-53:8, 99:8-10). Her supervisors could not agree on how long it was supposed to take her to microfilm, nor how many days it was taking her to do it. (Kennedy Dep. 87:5-21; Excell Dep. 28:2-18; 29:1-30; Griffin Dep. 72:23-73:10). When Ms. Jacobs asked about what she should change when it came to microfilming, Ms. Kennedy told her to keep doing it the way she was doing it. (Jacobs Dep. 230:5-18). Thus, there is a dispute of fact as to whether Ms. Jacobs' microfilming speed was a real concern. Similarly, Defendants contend that Ms. Jacobs was found sleeping on the job. In addition to Ms. Jacobs' testimony that she did not sleep when working (Jacobs Dep. 118:22-119:6), Defendants' witnesses gave contradictory testimony that undermines this claim. For example, Ashley English alleged that she saw Ms. Griffin wake Ms. Jacobs (English Dep. 63:10-22); Ms. Griffin denied that she ever saw Ms. Jacobs sleeping. (Griffin Dep. 73:21-25). Thus, Ms. Jacobs' direct testimony not only contradicts that of Defendants' witnesses, Defendants' own witnesses offered incompatible versions.

For purposes of summary judgment, a court does not weigh evidence or make credibility determinations. *Mercantile Peninsula Bank v. French (In re French),* 499 F.3d 345, 352 (4th Cir. 2007). Under the circumstances of this case, there is sufficient evidence from which a jury could reject Defendants' post-hoc, inconsistent assertions -- made after Ms. Jacobs requested an accommodation -- and determine that Ms. Jacobs was capable of, and was, performing the essential functions of her job.

C. Circumstances and Timing of the Firing Raise Strong Inferences of Unlawful Discrimination

As discussed in more detail in Section E, *infra,* the circumstances, timing, and changing rationales related to Ms. Jacobs' termination are strong indicia that the discharge was the result of unlawful discrimination.

*1. The Timing of the Termination Raises a Strong Inference of Discrimination*

Evidence that the adverse action occurred shortly after the employer became aware of the protected activity is sufficient to make a *prima facie* case of causation. *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir. 1998) (citing *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir.1989)).

The uncontested facts show: Ms. Jacobs requested an accommodation by email on September 8, 2009. (Pl. Ex. 1) She forwarded the request by email to Ms. Tucker on September 9, 2009. (Pl. Ex. 6) Ms. Kennedy informed Ms. Jacobs that she would have to wait until Ms. Tucker returned to the office to have her request addressed. (Jacobs Dep. 165:14-166:19; Kennedy Dep. 90:16-92:5; Radewicz Dep. 60:16-61:8; Tucker Dep. 50:18-51:7) Ms. Tucker returned on September 29, 2009 and fired Ms. Jacobs that day. (Jacobs Dep. 166:13-23; Tucker Dep. 93:12-17, 95:1-3). Ms. Tucker contends that she did not read the email until that day. (Tucker Dep. 96: 17-21) Yet Ms. Jacobs saw the email, with Ms. Tucker's notes, on Ms. Tucker's desk during the meeting when the termination occurred. (Jacobs Dep. 239:20-21; Pl. Ex. 6). Thus, a jury could very reasonably conclude that Ms. Tucker fired Ms. Jacobs either on the very day she learned about Ms. Jacobs' request for accommodation, or on the day she first returned to the office after learning about the request. In either event, the temporal relation between the request and the

18

termination would support a jury finding of causation.

### 2. The Circumstances of the Termination Raise A Strong Inference of Discrimination

The circumstances of Ms. Jacobs' termination are similarly compelling and would support a jury determination of discrimination. *See Ennis, supra*, 53 F.3d at 58 (identifying circumstances that raise a reasonable inference of discrimination as supporting an ADA claim).

When Ms. Jacobs requested an accommodation, her supervisors consciously determined to take no action until Ms. Tucker returned, notwithstanding that they and Ms. Radewicz had the authority to make work assignments. (Radewicz Dep. 60:16-61:11; Excell Dep. 25:16-26:5). As discussed more fully in Section III, *infra*, this refusal to engage with Ms. Jacobs about her request was discriminatory in itself. It is also indicative of a lack of willingness to address Ms. Jacobs' disability and request for accommodation.

On the day Ms. Tucker returned, she first met with the supervisors and then fired Ms. Jacobs. (Jacobs Dep. 167:22-23; Tucker Dep. 93:20-25; Kennedy Dep. 141:18-23). When she called Ms. Jacobs into the meeting, all three supervisors were present and the email Ms. Jacobs had sent requesting an accommodation was on Ms. Tucker's desk with Ms. Tucker's notes on it. (Jacobs Dep. 239:20-21). Ms. Tucker testified to a lack of memory about when she printed the email, but ultimately denied that she had read the email before calling Ms. Jacobs in to fire her. (Tucker Dep. 95:19-96:23). In addition to this being a direct contradiction to Ms. Jacobs' unchanging and clear memory of seeing the email on the desk, other undisputed facts undermine Ms. Tucker's version: The very reason that Ms. Jacobs' supervisors gave for taking no action on her request for accommodation was that they needed to discuss it with Ms. Tucker first. It is implausible that they waited three weeks to have this conversation with Ms. Tucker and then simply failed to mention it during a meeting specifically relating to Ms. Jacobs employment.

The meeting began with Ms. Jacobs referring to her request for accommodation, and Ms. Tucker's response indicates that she is aware of what Ms. Jacobs is referring to:

> **Christina**: Okay. Basically, just what the email said, I just wanted to know if –
> and I know that times are difficult right now – but if there was any other thing that

I could be moved to, and maybe not be at the Front Counter as much as I am, even though it's not a lot. I just think it would be better – I'd be better able to handle it.

   **Ms. Tucker**: Can you tell me – that's all that you're asking, is just to be moved.

(Pl. Ex.7; Pl. Ex. 8). After Ms. Tucker indicated Ms. Jacobs was being fired, the transcript reads:

>    **Christina**: Is it because of the email? Because I would much rather stay at the front than –
>
>    **Ms. Tucker**: It doesn't have anything to do with the email, Christina.

(Id). Ms. Tucker did not ask what email Ms. Jacobs was referring to or stop the conversation to search for and read the email, as she testified. (Tucker Dep. 95:19-96:23). There is no pause in conversation or sound of a printer in the audio recording to indicate the time that was spent to search through three week of emails, print and read the email to which Ms. Jacobs was referring. (Pl. Ex.7; Pl. Ex. 8).

   The content of the notes on Ms. Tucker's copy of the email are consistent with her having written those notes before calling Ms. Jacobs in to fire her. For example, most of the bottom portion of the email is taken up with detailed notes about the dates and times that Ms. Jacobs took sick time while Ms. Tucker was on vacation. (Pl. Ex. 6) While Ms. Tucker testified that she made the notes in anger after she was told that Ms. Jacobs was talking to others in the office about her termination, it is hard to imagine why she would have gathered and recorded attendance information in anger.

   Ms. Tucker's notes on Ms. Jacobs' request for accommodation are noteworthy for another reason: they say nothing about Ms. Jacobs' job performance or any of the other purported reasons Defendants have since given for Ms. Jacobs' termination. Rather, they all relate to the Clerk's view of why Ms. Jacobs would not be accommodated ("explained front counter" and "I offered her an OA [Office Assistant] previously / she refused") and to Ms. Jacobs' requests for leave while she was awaiting a discussion of her need for accommodation. (Id). The notes include input specifically derived from others ("told Excell this was in college" and the aforementioned sick leave information). If Ms. Tucker were taking notes in anger about an employee she had just discharged for "not getting it," those notes would look very different. Instead, these notes are consistent with Ms. Tucker having discussed the request with

Ms. Jacobs' supervisors, making notes related to the discussion on the email printout, and having that document on her desk when she finally called Ms. Jacobs in to the meeting.

Defendants' version of the circumstances regarding Ms. Jacobs' termination requires a jury to believe that Ms. Tucker met with Ms. Jacobs' supervisors, did not read the email sent to her that she (Ms. Tucker) had printed out and written on and was subsequently placed in Ms. Jacobs' personnel file, and that she had no conversations regarding the accommodation request with the supervisors who had waited three weeks to talk with her about it. By contrast, there is ample, consistent, and coherent evidence from which a jury could conclude that Ms. Tucker read Ms. Jacobs' request, discussed it with other management, made notes on the print-out reflecting her thoughts about the request and supervisors' input regarding the use of sick time, and then called Ms. Jacobs in and fired her.

D. Ms. Jacobs' Firing, Shortly After Her Written Request for Accommodations, Was Retaliatory

Retaliation may be proven by direct evidence of retaliatory motivation *or* through proof of pretext by application of the framework set out in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Hill v. Lockheed Martin Logistics Mgmt.,* 354 F.3d 277, 284-85 (4th Cir. 2004) (noting that discrimination may be proven by direct evidence or by demonstrating pretext).

Ms. Tucker's notes on Ms. Jacobs' request for accommodation reflect a strongly adverse reaction to the request. For example, Ms. Tucker wrote "lied in the beginning," and "explained front counter" in apparent reference to her position that Ms. Jacobs had misled Ms. Tucker in regard to her ability to work the front counter. (Tucker Dep. 75:21-25). The notes regarding Ms. Jacobs' use of sick time after the request for accommodation are likewise indicative that use of sick time was part of the discussion of the request. (Pl. Ex. 6). Ms. Jacobs had ample sick time, and was using that time in part because of the adverse affects of not having her request for accommodation addressed. (Pl. Ex. 4 ¶¶ 13-14).

Ms. Tucker's reaction to Ms. Jacobs' request, and the evidence of pretext described in more detail in the next section, are ample evidence from which a jury could conclude that Ms. Jacobs' termination was the result of retaliation for her request for accommodation.

E. Substantial Evidence in the Record Shows that the Reasons Given for Termination Were Pretextual, Making Summary Judgment Improper

If a nondiscriminatory reason for an adverse action is offered, it may be rebutted by a showing that the purported reason was pretext. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000). To establish pretext, it is sufficient to show that the proffered reasons were false. *Id.* at 147 ("rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.") (citations and emphasis omitted). "(T)he trier of fact's "rejection [or disbelief] of the [employer's] proffered reasons [for its actions] will permit the trier . . . to infer the ultimate fact of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); *see also Wilson v. Phoenix Specialty Mfg. Co.*, 513 F.3d 378, 387, (4th Cir. 2008) (where the district court's disbelief of employer's proffered reasons for employee's termination was based in part on the court's determination that the reasons the company gave to the EEOC were different than the one advanced at trial.); and *Coburn v. Rockwell Automation, Inc.*, 238 Fed. Appx. 112, 122 (6th Cir. 2007) ("Inconsistency in an employer's explanation of the reasons for an adverse action raises an inference [of pretext] that must be drawn, at summary judgment, in favor of the nonmovant.").

To defeat summary judgment, "the plaintiff's burden is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief." *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. Wyo. 2008)(citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1321 (10th Cir. 1997)). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 1158. "Ultimately, whether a jury chooses to believe the [plaintiff or defendant's] version of events depends on the credibility of each party's witnesses, and credibility determinations are for the jury to decide." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. Ohio 1998).

Defendants have taken implausible, changing positions with regard to the reason for Ms. Jacobs'

22

termination. When Ms. Jacobs was discharged, she was told it was because she wasn't "getting it." (Tucker Dep. 95:1-9). A review of their evolving positions over time shows that Defendants have attempted to expand the rationale in order to cast Ms. Jacobs in an increasingly bad light, and that significant evidence rebuts Defendants' various claims.

### 1. The Stated Reason at the Time of Termination

Ms. Tucker told Ms. Jacobs she was being fired for being slow and not "getting it." Defendants admit "Ms. Tucker told plaintiff that budget cuts necessitated that all employees take on more tasks to keep the office running efficiently." (Am. Ans. ¶ 22). At the time, the Clerk's office was under a hiring freeze. (Am. Ans. ¶ 2). It is illogical for the Clerk to have fired Ms. Jacobs for being slow and not "getting it," when the termination would result in fewer people to do the work.

While Ms. Tucker noted Ms. Jacobs' anxiety disorder in her personnel file, and Ms. Kennedy detailed Ms. Jacobs' leave requests after the accommodation request, Ms. Jacobs' file is noticeably devoid of write-ups or corrective actions for any of the reasons subsequently offered for her termination.

### 2. The EEOC Charge Response

In responding to Ms. Jacobs' EEOC Charge in this case, Ms. Tucker asserted several defenses that were not offered at the time of termination and have been debunked by the evidence developed during discovery: Ms. Tucker alleged to the EEOC that Ms. Jacobs had "outbursts" and that staff avoided addressing issues with her because of these "outbursts." She specifically stated that Ms. Jacobs became angry with her trainer. Ms. Tucker made no such allegation at the time of Ms. Jacobs' termination or in any documented discipline prior to termination.

Notably, neither woman who trained Ms. Jacobs testified to any outbursts or expressions of anger. (English Dep. p. 77; Stewart Aff.). To the contrary, Ashley Stewart claims that Ms. Jacobs was friendly with other employees. (Stewart Aff. ¶ 7). None of Defendants' witnesses could testify to any firsthand knowledge of any alleged "outbursts." Defendants' witnesses indicated that Ashley English was the source of negative information about Ms. Jacobs' work and alleged conflicts. (Excell Dep. 114:13-17; Kennedy Dep. 167:22-168:1). However, Ms. English remembered no such events and denied that she had

reported such things to anyone. (English Dep. 66-:10-67:5).

Ms. Tucker wrote to the EEOC: "I had no knowledge of any disability or work impairment until after the decision to terminate." (Tucker Dep. Ex. 22, Doc. 54 at 80-84; Tucker Dep. 74:23-24). In actuality, Ms. Tucker's note in May 2009 specifically identified Ms. Jacobs' anxiety disorder and noted Ms. Jacobs' concern about how working at the front counter concerned her in relation to her disorder.

Ms. Tucker told the EEOC: "Ms. Jacobs never mentioned or even alluded to the fact that she had a disability or any medical condition that would keep her from fulfilling the duties of a Deputy Clerk." Again, Ms. Tucker's note – written in relation to Ms. Jacobs' first request for accommodation – specifically contradicts this assertion. There, Ms. Tucker wrote "worried there might be a problem" and "don't want to reflect badly." (Tucker Dep. 75:21-25; Pl. Ex. 5).

Ms. Tucker "vehemently denie[d]" that she had any knowledge of Ms. Jacobs' disability or that she read the email from Ms. Jacobs prior to terminating her. As noted above, these statements are false: her own note indicates her knowledge of Ms. Jacobs' disability and the facts and circumstances of Ms. Jacobs' termination – and the direct evidence from Ms. Jacobs – demonstrate that Ms. Tucker had read Ms. Jacobs' request prior to terminating her.

3. *Post-Charge Response & During the Litigation*

After the EEOC issued a "cause" determination and Plaintiff filed suit, Defendants asserted additional bases for firing Ms. Jacobs, all of which are contradicted by other evidence.

Defendants now allege that Ms. Jacobs was asleep on the job. (Tucker Dep. 125:6-25). This allegation was not made at the time of termination or to the EEOC. Defendants' witnesses have made contradictory statements as to the source of this allegation, and Ms. Jacobs has denied this allegation. (English Dep. 63:10-22; Griffin Dep. 73:21-25). Defendants' witnesses worked out details regarding this allegation together in advance of their depositions. (Radewicz Dep. 9:11-10:10.)

Defendants now allege that Ms. Jacobs failed to follow procedure in calling in sick. (Kennedy Dep. 121:19-122: 5). This allegation was not made prior to discovery in this case. Further, Defendants' own policies state that an employee should call a supervisor if the employee needs to take a sick day.

24

(Kennedy Dep. Ex. 10, Doc. 54 at 56). That is exactly what Ms. Jacobs did. (Jacobs Dep. 120:5-121:8).

Affidavits from Ms. Jacobs' former co-workers contain additional allegations unrelated to any reasons previously stated for termination and do not say whether anyone was even made aware of any of the "issues" that are now being raised (Mathis Aff. ¶ 8; Stewart Aff.; English Dep. 66:10-67:5).

Ms. Jacobs' termination has significant indicia of discrimination, including strong temporal proximity and substantial evidence of pretext. Because there is ample evidence of discrimination, Defendants' Motion for Summary Judgment should be denied.

**III.    Defendants' Failure to Provide a Reasonable Accommodation Violated the ADA**

A. There is Significant Evidence that Defendants Knew of Ms. Jacobs' Disability and Request for a Reasonable Accommodation

"When an individual decides to request accommodation, the individual or his/her representative must let the employer know that s/he needs an adjustment or change at work for a reason related to a medical condition. To request accommodation, an individual may use 'plain English' and need not mention the ADA or use the phrase "reasonable accommodation." *EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, Notice No. 915.002 (Oct. 17, 2002). *See also, Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 997, 3 AD Cas. (BNA) 1141, 1146-47 (D. Or. 1994) ("statute does not require the plaintiff to speak any magic words. . . The employee need not mention the ADA.")

1. Defendants Were Aware of Ms. Jacobs' Disability

Ms. Jacobs took all steps available to her to put Defendants on notice of her disability and to request accommodations. She disclosed her disability to Ms. Excell in May 2009. Ms. Tucker was well aware of this disclosure and made a specific note of it for Ms. Jacobs' file. (Tucker Dep. 75; Pl Ex 5). It is patently absurd for Defendants to contend that Ms. Tucker was unaware of Ms. Jacobs' disability.[4]

_____

[4] Defendants mischaracterize Plaintiff's deposition testimony to say that Plaintiff "confirms that Tucker had no knowledge of her alleged 'disability'." (Def.'s Mot. Summ. J. 11). In reality, Ms. Jacobs, when questioned about paragraph 27 of her Amended Complaint, responded that "Ms. Tucker has said that she didn't know I have social anxiety disorder...in light of that fact, I would say that it was because I had asked for a reasonable accommodation but not specifically because of the specific disorder, just because I had requested an accommodation

2. Defendants Were Aware of Ms. Jacobs' Request for an Accommodation

Ms. Jacobs emailed all three of her supervisors on September 8, 2009. Ms. Jacobs made the subject of that email "Front Counter Accommodation" and mentioned specifically her diagnosis of social anxiety disorder. She asked to be trained in a different role and perhaps to work at the counter only once a week. She closed by stating that "under the circumstances of my disability, I need to do whatever I can to accommodate so I can continue to contribute to the successfulness of the Clerk's Office." (Pl. Ex. 1). Ms. Kennedy file stamped the email on September 9, 2009, because it was a request to be moved and she thought it was important. (Kennedy Dep.96:14-16; Pl. Ex. 1). The three supervisors and Ms. Radewicz, Ms. Tucker's assistant, had the authority to re-assign Ms. Jacobs. (Radewicz Dep. p. 59-61; Tucker Dep. pp. 63-64.) They chose not to take any action on Ms. Jacobs' request. (Kennedy Dep.90:16-92:5).

Ms. Jacobs forwarded the email to Ms. Tucker on September 9, 2009. (Jacobs Dep. 165:14-17; Pl. Ex.6). Ms. Jacobs' accommodation request was on Ms. Tucker's desk when Ms. Jacobs was called into Ms. Tucker's office. (Jacobs Dep. 236:9-11, 239:20-21; Pl. Ex. 6). Rather than act on Ms. Jacobs' request, or engage in any discussion of possible alternatives, Ms. Tucker fired Ms. Jacobs.

As noted above, the denial that there was any discussion of Ms. Jacobs' request prior to termination flies in the face of reason and evidence. The supervisors, who all admitted to reading the request, met with Ms. Tucker before Ms. Jacobs was terminated. (Kennedy Dep. 90:5-10; Griffin Dep. pp. 45:23-47:1; Excell Dep. pp. 54:18-55:23). When Ms. Jacobs asked if what was happening was related to the email, Ms. Tucker did not ask what email she was referring to because she already knew. Her

---

for a disorder." (Jacobs Dep. 242: 17-29). In other words, Ms. Jacobs was speculating as to why Ms. Tucker might deny that she knew of the disability. Ms. Jacobs did not "confirm" that Ms. Tucker had no knowledge of Plaintiff's disability; she testified as to what Ms. Tucker has said. Moreover, Ms. Jacobs could not "confirm" any lack of knowledge by Ms. Tucker, particularly in light of Ms. Tucker's own admission that she was told about Ms. Jacobs' social anxiety disorder in May 2009 and made a note of it for the file. (Tucker Dep. 75:21-25).

Ms. Jacobs clarified during re-direct that the discrimination was because of Ms. Jacobs' disability, as well as discrimination and retaliation for making the request. (Jacobs Dep. 247:14-249:4). Defendants argue that the re-direct testimony is inadmissible and cannot serve to create a genuine issue of material fact. However, there was no objection to any of the questions asked on re-direct and any objection to the form was waived as it was not made at the time the question was asked per the stipulations. (Jacobs Dep. 5: ¶ 3).

denial that the termination was related to the email was actually a tacit admission that she knew exactly to which email Ms. Jacobs was referring. (Pl. Ex. 7; Pl. Ex. 8).

It is undisputed that Ms. Jacobs' supervisors were aware of her request for accommodation and had the power to change her work assignment. There is substantial evidence that Ms. Tucker was fully aware of Ms. Jacobs' disability and her request for accommodation.

B. Plaintiff was Able to Perform the Essential Functions of her Position, and Sought an Accommodation that Was Reasonable Under the Circumstances

"A job function may be considered essential for any of several reasons, including but not limited to the following: (i) The function may be essential because the reason the position exists is to perform that function; (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 C.F.R. § 1630.2(n)(2).

There were about 30 deputy clerks in the Criminal Division. (Tucker Dep. 20:16-21:21). All were trained to perform front counter tasks. (Tucker Dep. 52:3-14). Two clerks at a time worked the front counter. (Kennedy Dep. 19:2). Deputy clerks performed varied tasks, including dispositions, cashier, intake, courtroom clerk, filing, orders for arrest, data entry, calendars and bookkeeping. (Kennedy Dep. 13:14-17, 20:23-25). Many deputy clerks never worked the front counter, even though they had been trained to do so and had done so in the past. (Griffin Dep. 45:14-15; Kennedy Dep. 34:8-20).

Defendants have failed to show that working the front counter was an essential function of Ms. Jacobs' position. The position did not exist to perform front counter work, there were sufficient other employees who could perform the front counter work, and the work performed by front counter clerks was not specialized. 29 C.F.R. § 1630.2(n)(2); *see also, Tate v. Farmland Indus., Inc.,* 268 F.3d 989, 993 (10th Cir. Okla. 2001) ("The question of whether a job requirement is a necessary requisite to employment initially focuses on whether an employer actually requires all employees in the particular position to satisfy the alleged job-related requirement.")

27

Ms. Jacobs' request was reasonable both because working the front counter was not an essential function and because, contrary to Defendants' assertion (Def.'s Mot. Summ. J. at 32), Ms. Jacobs did not request that she not be required to work at the front counter <u>at all</u>; she indicated that she wanted to reduce her time at the front counter and learn to do some of the other tasks required of deputy clerks. (Pl. Ex. 1).

Even if the Defendants' could show that working at the front counter was an essential function of working as a deputy clerk and that moving Ms. Jacobs to dispositions or other data entry positions was impracticable, Ms. Jacobs' anxiety issues in interacting with the public at the front counter did not prevent her from doing the essential functions of the deputy clerk position. *See supra*, Section II.B., pp. 18-21. Ms. Jacobs currently works in a front counter position at Atlantic Towers. (Jacobs Dep. 205: 18-20). She is successful in that position and has decreased anxiety that she credits to the side-by-side training that was more long lasting than her training at the Clerk's Office and her supportive co-workers. (Pl. Ex. 4 ¶ 16). Dr. Coleman opined that had Ms. Jacobs had similar side-by-side training at the Clerk's Office, she would have performed without debilitating anxiety. (Pl. Ex. 2 ¶ 6).

Ms. Jacobs' request was intended to start a discussion with her employer regarding how she could continue to contribute in the face of her disability. *See* Pl. Ex. 1 ("Under the circumstances of my disability, I need to do whatever I can to accommodate so that I can continue to contribute to the successfulness of the Clerks' Office.") Defendants failed to engage in the interactive process that is required when an employee makes such a request for an accommodation. *See U.S. Airways v. Barnett*, 535 U.S. 391, 407 (Stevens, concurring)("The Court of Appeals also correctly held that there was a triable issue of fact precluding entry of summary judgment with respect to whether [the employer] violated the statute by failing to engage in an interactive process concerning [the employee]'s three proposed accommodations"); *see also, EEOC v. Fed Express Corp.*, 513 F.3d 360 375-376 (4th Cir. 2008)(holding that failure to engage in interactive process supported finding of bad faith) and *Haneke v. Mid-Atlantic Capital Mgmt*, 131 Fed Appx 399, 400, 2005 U.S. App. LEXIS 8186 (4th Cir. 2005)(*per curiam*)("Implicit in the fourth element [that the covered entity refused to make a reasonable accommodation] is the ADA requirement that the [parties] engage in an interactive process to identify a

28

reasonable accommodation").

Ms. Jacobs' request for an accommodation was met with avoidance by three supervisors who were all made aware of Ms. Jacobs' disability and request in an email that they acknowledge receiving. Ms. Jacobs was told that she needed to wait approximately three weeks for Ms. Tucker to return. No temporary solutions were implemented or even proposed. Ms. Jacobs was not asked for more information, but simply told to wait. When Ms. Jacobs attempted to use some of her accrued leave time to get through the waiting period of when her accommodation would be addressed, she was questioned about why she wanted leave and then the requests were denied. Previous leave requests were not met with questioning and had always been approved. (Jacobs Dep. 165:14-166:19; Pl. Ex. 4 ¶¶13-14).

Under the circumstances, Defendants' failure to engage in the interactive process or provide a reasonable accommodation violated the ADA.

## IV. Defendants' Co-mingling of Plaintiff's Medical Records in Her Personnel File Violated the ADA as a Matter of Law

Defendants make no argument in their brief as to Ms. Jacobs' claim that they violated the ADA by commingling medical information in her personnel file. (Am. Compl. ¶ 36.) Such commingling is forbidden by the ADA. 42 U.S.C. 12112(d); *see also EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, fn. 28, http://www.eeoc.gov/policy/docs/accommodation.html#N_28_ ("Employers must maintain the confidentiality of all medical information collected during this process, regardless of where the information comes from.")

Here, there is no dispute that information about Ms. Jacobs' anxiety disorder was placed in her personnel file. (Am. Compl. ¶ 13; Am. Ans. ¶ 13.) Ms. Tucker admitted that she wrote the note, and Ms. Radewicz admitted that she wrote Ms. Jacobs' name and date on the note and placed it in Ms. Jacobs' personnel file. (Tucker Dep. 75:15-76:6; Radewicz Dep. 43:21-45:5; Pl. Ex. 5) Therefore, Defendants engaged in a per se violation of the ADA, and are not entitled to summary judgment.

29

A non-moving party shall be granted summary judgment where plaintiff is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Ms. Jacobs is entitled to judgment in her favor on her claim that Defendants violated the ADA in co-mingling her medical information with her personnel file. Id.

## V. Statement of Genuine Issues of Material Fact

Plaintiff submits the following issues of material fact to be tried:

A. Whether Plaintiff is an individual with a disability as defined in the ADAAA;

B. Whether Defendants had knowledge of plaintiff's disability;

C. Whether Plaintiff was a "qualified individual" who could perform the essential functions of her job, with or without a reasonable accommodation;

D. Whether Defendants' failure to engage in the interactive process and provide a reasonable accommodation was discriminatory;

E. Whether Defendants' decision to terminate Plaintiff's employment was based on her disability;

F. Whether Defendants' decision to deny Plaintiff's leave requests and terminate her employment was in retaliation for Plaintiff's request for a reasonable accommodation.

## CONCLUSION

For the foregoing reasons, there are genuine issues of material fact to be determined by a jury, and Defendants' Motion for Summary Judgment should therefore be denied.

WHEREFORE, Plaintiff respectfully prays the Court deny Defendants' Motion for Summary Judgment and grant judgment as a matter of law on Plaintiff's Second Cause of Action that Defendants violated the ADA in commingling her medical information with her personnel file.

Respectfully submitted this 21st day of November, 2012.

EDELSTEIN & PAYNE
/s/ Vanessa K. Lucas
N.C. State Bar No. 33582
Raleigh, North Carolina 27608
Post Office Box 28186
Raleigh, N.C. 27611
vanessa@edelsteinpayne.com
Tel: (919) 828-1456
Fax: (919) 828-4869

DISABILITY RIGHTS NORTH CAROLINA
/s/ Lisa Grafstein
North Carolina Bar No. 22076
lisa.grafstein@disabilityrightsnc.org
/s/ A. Mercedes Restucha-Klem
North Carolina Bar No. 40018
mercedes.restucha@disabilityrightsnc.org
2626 Glenwood Avenue, Suite 550
Tel: (919) 856-2195
Fax: (919) 856-2424

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has electronically filed the foregoing **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel for Defendants, Grady L. Ballentine, Valerie Bateman, and Kathryn Shields.

This 21st day of November, 2012.

EDELSTEIN & PAYNE
/s/ Vanessa K. Lucas
Vanessa K. Lucas
N.C. State Bar No. 33582
Post Office Box 28186
Raleigh, N.C. 27611
Tel: (919) 828-1456
Fax: (919) 828-4869
vanessa@edelsteinpayne.com

DISABILITY RIGHTS NORTH CAROLINA
2626 Glenwood Avenue, Suite 550
Raleigh, North Carolina 27608
Telephone: (919) 856-2195
Facsimile: (919) 856-2424

/s/ Lisa Grafstein
Lisa Grafstein
North Carolina Bar No. 22076
lisa.grafstein@disabilityrightsnc.org

/s/ A. Mercedes Restucha-Klem
A. Mercedes Restucha-Klem
North Carolina Bar No. 40018
mercedes.restucha@disabilityrightsnc.org